14 CV          4644

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DARYL M. PAYTON, and BENJAMIN DURANT, III,<br><br>Defendants. | Civil Action No. _____<br><br>ECF CASE<br><br>JURY TRIAL DEMANDED |



## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### SUMMARY OF THE ACTION

1.     This matter involves unlawful insider trading ahead of International Business Machines Corporation's ("IBM") 2009 acquisition of SPSS Inc. ("SPSS") by two industry professionals associated at relevant times with a Connecticut-based registered broker-dealer (the "Broker"): Daryl M. Payton ("Payton") and Benjamin Durant, III ("Durant") (collectively, the "Defendants").

2.     As described in a related, previously filed enforcement action captioned <u>SEC v. Conradt, et al.</u>, Civ. Act. No. 12-cv-08676-JSR (the "Initial Action"), in late May 2009 Trent Martin ("Martin"), then an Australian Equities Analyst at a registered broker-dealer, learned material, nonpublic information regarding the pending SPSS acquisition (the "SPSS Acquisition") from his close friend, an associate at a New York law firm (the "Law Firm") who worked on the acquisition. Martin misappropriated the information from his friend, purchased

SPSS securities on the basis of that information, and tipped that information to his friend and roommate, Thomas Conradt ("Conradt"), who also was a registered representative with the Broker. Conradt tipped several other registered representatives associated with the Broker, including David J. Weishaus ("Weishaus"), who was the third defendant in the Initial Action, as well as Defendants Payton and Durant. Each of Conradt, Weishaus, Payton, and Durant traded on the basis of that information.

3.      The illegal trading of Defendants Payton and Durant as alleged herein resulted in ill-gotten gains exceeding $290,000.

4.      Martin, Conradt, and Weishaus have since pled guilty to conspiracy to commit securities fraud and/or securities fraud arising in parallel criminal proceedings, see U.S. v. Conradt, et al., 12 Crim. 887 (S.D.N.Y.) (the "Criminal Proceedings"); and consented to judgments in the Initial Action ordering injunctions and disgorgement of all ill-gotten gains. Weishaus was also ordered to pay a civil penalty; the judgments entered against Martin and Conradt deferred civil penalty determinations until a later time.

5.      By this Complaint, the Commission now charges Payton and Durant with illegal trading in SPSS securities in violation of the federal securities laws. By knowingly or recklessly engaging in the conduct described in this Complaint, each of Defendants Payton and Durant violated and, unless restrained and enjoined by the Court, will continue to violate Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

6.      The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§78u(d) and 78u-1], to enjoin such acts, practices, and courses of

business; and to obtain disgorgement, prejudgment interest, civil money penalties and such other and further relief as the Court may deem just and appropriate.

7.     This Court has jurisdiction over this action pursuant to Sections 21(d) and (e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e), 78u-1 and 78aa].

8.     Venue in this District is proper because the Defendants are found, inhabit, and/or transact business in the Southern District of New York and because one or more acts or transactions constituting the violation occurred in the Southern District of New York.

9.     In connection with the conduct alleged in this Complaint, Payton and Durant made use of a means or instrumentality of interstate commerce, of the mails, or of a facility of any national securities exchange.

**DEFENDANTS**

10.     **Daryl M. Payton**, age 38, resides in New York, New York.  From November 1, 2007 until November 10, 2009, Payton was a registered representative associated with the Broker at its Westport, Connecticut and New York City offices.  In 2002, he passed both the General Securities Representative Examination ("Series 7 Exam") and the Uniform Combined State Law Examination ("Series 66 Exam").  He previously worked with Durant at a financial advisory firm and, at all relevant times, worked and was friends with Durant, Weishaus, and Conradt.

11.     **Benjamin Durant, III**, age 37, resides in New York, New York.  From January 26, 2009 until November 10, 2009, Durant was a registered representative associated with the Broker at its New York City office.  At relevant times, Durant was also a Certified Financial Planner.  In 2001, he passed both the Series 7 Exam and the Series 66 Exam.  Durant previously

3

worked with Payton at a financial advisory firm and, at all relevant times, worked and was friends with Payton, Weishaus, and Conradt.

## RELATED PERSONS AND ENTITIES

12.     Up until its acquisition by IBM in October 2009, **SPSS Inc.,** headquartered in Chicago, Illinois, was a provider of predictive analytics software that performed such functions as statistical analysis, data mining, performance measurement, and fraud detection. At all relevant times, its shares were publicly traded on the NASDAQ under the symbol "SPSS."

13.     The **Broker** is a Westport, Connecticut-based broker-dealer and investment adviser registered with the Commission. At times relevant to this Complaint, the Broker employed Defendants Payton and Durant, as well as Weishaus and Conradt.

14.     The **Law Firm** is a law firm with an office in New York, New York.

15.     At all times relevant to this Complaint, **Michael Dallas ("Dallas"),** was a citizen of New Zealand, a resident of New York, and an associate at the Law Firm. Beginning in December 2008, Dallas was assigned to the Law Firm's Mergers & Acquisitions ("M&A") Practice Group. On or about May 26, 2009, Dallas was assigned to work on IBM's acquisition of SPSS.

16.     From August 2008 through mid-September 2009, **Trent Martin,** an Australian citizen, worked in New York City as an Equities Salesman with a broker-dealer. In September 2009, while still residing in New York, Martin transferred to a related broker dealer in Connecticut, where he continued to work as an Equities Salesman until November 2010.

17.     From September 2, 2008 until October 13, 2009, **Thomas C. Conradt,** a lawyer, was employed as a registered representative with the Broker in its New York City office,

4

working with Payton and Durant.  At all relevant times, Conradt was Martin's roommate and was friends with Payton, Durant, and Weishaus.

18.     **David J. Weishaus**, a lawyer, was employed as a registered representative with the Broker from October 8, 2007 until November 10, 2009.  He worked in the Broker's New York City office from January 2008 through September 2008, and its North Palm Beach, Florida office from October 2008 through November 10, 2009.  Weishaus attended the same law school as Conradt, graduating a year later.  At all relevant times, Weishaus was friends with Conradt, Payton, and Durant.

## FACTS

**A.     IBM's Acquisition of SPSS and the Involvement of Dallas and the Law Firm.**

19.     On January 23, 2009, IBM retained the Law Firm in connection with its possible acquisition of SPSS.  In early April 2009, IBM informed SPSS that IBM had an interest in making an offer to purchase SPSS, culminating in an April 15, 2009 letter from IBM to SPSS setting forth a non-binding offer to purchase SPSS.

20.     On May 26, 2009, SPSS and IBM entered into a supplemental agreement to an existing confidentiality agreement in advance of IBM commencing due diligence.

21.     On or about that same day, the Law Firm assigned Dallas to work on the proposed SPSS Acquisition and he continued to work on the SPSS Acquisition through October 2, 2009.  This was Dallas's first "start to finish" assignment in the Law Firm's M&A practice group and the first time that he was part of a team of attorneys advising a principal in an M&A transaction.

22.     As a member of the M&A practice group, Dallas knew that the information that he received regarding the SPSS Acquisition was nonpublic, and that maintaining its confidentiality was important to the success of the ultimate transaction.  The participants to the

transaction had safeguards in place to protect the confidentiality of the information, including confidentiality agreements and code names when referencing the transaction. At the Law Firm, the SPSS Acquisition was identified by the pseudonym "Pipestone" to preserve its confidentiality.

23.     Upon being assigned to work on this engagement, Dallas learned material, nonpublic information about the transaction, including the anticipated (per share) purchase price and the identity of the participants in the transaction. Dallas had a duty to keep all of this material, nonpublic information confidential.

24.     On June 6, 2009, the Law Firm sent SPSS's counsel an initial draft of a merger agreement.

25.     The transaction progressed, and during the late evening on July 27, 2009, SPSS and IBM executed the merger agreement. At 7:31 a.m. on July 28, 2009, the parties issued a joint press release announcing to the public the proposed acquisition, in which IBM would acquire SPSS in an all cash transaction for approximately $1.2 billion or $50 per share (the "Announcement"). The acquisition was completed on October 2, 2009.

26.     On July 27, 2009, the last trading day prior to the Announcement, the closing price of SPSS stock was $35.09. On July 28, 2009, the day of the Announcement, SPSS's stock closed at $49.45 per share on heavy volume, an increase of 40.9% from the previous day's closing price.

**B.      Martin and Dallas Had a History, Pattern, or Practice of Sharing Confidences.**

27.     At all relevant times, Dallas and Martin had a history, pattern, or practice of sharing confidences such that a duty of trust or confidence existed between them.

6

28.     Dallas and Martin met in October 2008 through mutual friends, shortly after Dallas moved to New York. Dallas and Martin quickly became close friends. Dallas was working in the United States pursuant to a H1B Work Visa that was valid beginning on October 1, 2009 and that allowed Dallas to work for the Law Firm for a period of approximately three years, but for which any change in employment would require a new visa petition.

29.     Prior to the end of May 2009, Martin became Dallas's closest friend in New York and the person outside of work with whom Dallas spent the most time.

30.     From December 2, 2008 through the end of May 2009, Martin and Dallas directed more than two hundred e-mails to each other; some one-on-one, others as part of correspondence with a small group of friends.

31.     Prior to the end of May 2009, Martin and Dallas had developed a history of sharing confidences.

32.     For example, prior to the end of May 2009, Martin showed Dallas an internal, nonpublic work e-mail written by Martin, which Dallas understood to be nonpublic.

33.     Prior to the end of May 2009, Dallas and Martin discussed Dallas's work at the Law Firm, including his role as an associate working in the business and transactional groups at a large law firm, transactions on which he had worked or was working, clients for whom his practice group worked, his workload, and work issues as they arose. Martin understood that some of the information disclosed by Dallas in these discussions, including transaction details and the identity of clients, was nonpublic, and that Dallas expected him to maintain its confidentially.

34.     For example, in or around February 2009, after Dallas had told Martin that he had been assigned to the M&A practice group, Dallas told Martin about a bond transaction on which

7

he was working, including details that Martin knew to be nonpublic and confidential.  Martin

knew that Dallas expected him to maintain the confidentiality of that information.

     35.     Moreover, prior to the end of May 2009, Martin and Dallas also discussed

employment topics such as supervisors, work schedules, and compensation.

     36.     Martin and Dallas both understood that the information discussed about their jobs

was nonpublic and that the disclosing party expected the other to maintain its confidentiality.

     37.     Martin and Dallas also shared confidences of a more personal nature, including

details of relationships, their families, personal legal matters, and plans for the future.  For

example, prior to the end of May 2009, Martin confided to Dallas personal details regarding the

illness of a family member in Australia.

     38.     In early May 2009, Martin sought out Dallas's advice regarding a friend's legal

dispute over an employment non-compete agreement, revealing to Dallas the underlying facts

and legal strategies, to which Dallas responded in detail.

     39.     In June 2009, Martin also turned to Dallas for assistance with a personal and

confidential legal problem, expressing to Dallas concern about, among other things, the possible

implications for Martin's ability to remain in the United States.

     40.     Martin and Dallas both understood that the personal confidences they shared were

private and that the disclosing party expected the other to maintain that confidentiality.

     41.     Over the course of their friendship, Dallas never revealed, or traded on, any

confidential information that Martin shared with him.

     42.     Prior to June 2009, Martin never revealed, or traded on, any confidential

information entrusted to him by Dallas.

**C.    Dallas Disclosed to Martin Material, Nonpublic Information about the SPSS Acquisition in Confidence.**

43.    Upon his assignment to the SPSS Acquisition in May 2009, Dallas had been employed by the Law Firm for only eight months and had been working on M&A assignments for approximately three months.  He had not previously worked on an M&A project from start to finish, and he would be acting as an attorney adviser to a principal in the transaction.

44.    Dallas understood IBM to be one of the Law Firm's largest clients.  He anticipated that the work on the SPSS Acquisition would be very demanding, and he was concerned that his lack of experience in M&A might adversely affect his performance on the engagement.

45.    In late May 2009, soon after his assignment to the SPSS Acquisition, Dallas met Martin for lunch.  At that lunch, Dallas's assignment to the SPSS Acquisition was a topic of discussion between the two men, and Dallas sought from Martin moral support, reassurance, and advice with respect to his new assignment.  Dallas confided in Martin his concern as to his lack of experience, attempting to communicate to Martin the magnitude and importance of the assignment.  In so doing, Dallas revealed to Martin nonpublic information about the SPSS Acquisition, including the anticipated transaction price and the identities of the acquiring and target companies.  Dallas did not discuss this confidential information with anyone outside of the Law Firm other than Martin.

46.    At the time, Dallas understood that Martin was a securities professional who understood both the sensitivity of this type of information, as well as Dallas's role as a lawyer representing a client in a corporate acquisition.

47.     Based on their history of sharing and maintaining confidences, Dallas expected Martin to maintain the information that Dallas disclosed to him about the SPSS Acquisition in confidence.

48.     Martin knew that the information that Dallas disclosed to him about the SPSS Acquisition was nonpublic and, if disclosed, would affect the price of SPSS securities. Based on their history of sharing confidential information, Martin further knew that Dallas expected him to maintain the confidentiality of that information and to not disclose it to anyone.

49.     In June and July 2009, Dallas and Martin continued to communicate and spend time together and, in the course of his continued relationship with Dallas, Martin learned from Dallas additional, nonpublic information about the timing of the SPSS Acquisition that he knew or reasonably should have known that Dallas expected him to maintain confidentially.

50.     The nonpublic information about the SPSS Acquisition that Martin learned from Dallas is referred to herein as the "Inside Information."

51.     In late July 2009, after misappropriating and using the Inside Information to trade in SPSS securities, Martin first informed Dallas that he had done so, and apologized to Dallas for trading on the basis of that information, expressing regret and concern that his trading in SPSS securities could have adverse consequences for Dallas. After the Announcement, Martin twice again similarly apologized to Dallas.

**D.   Martin Misappropriated the Inside Information, Traded, and Tipped it to Conradt.**

52.     On June 3, 2009 and July 22, 2009, Martin misappropriated and used the Inside Information to trade for his own account. This trading resulted in profits of $7,625, which Martin has since disgorged in accordance with the judgment entered in the Initial Action.

53.     At all relevant times, Martin and Conradt were friends and roommates.

54.     Conradt, who had graduated from law school, periodically acted on behalf of the roommates to resolve issues with the apartment landlord.  On or about June 22, 2009, Conradt assisted Martin and Dallas with the personal and confidential legal problem that had possible implications for Martin's ability to remain in the United States.

55.     Prior to June 24, 2009, in violation of the duty of trust or confidence that he owed to Dallas, Martin misappropriated, and tipped the Inside Information then known to him to Conradt, later supplementing with the remainder of the Inside Information.

56.     On September 12, 2013, Martin pled guilty in the Criminal Proceedings to a charge of conspiracy to commit securities fraud.

**E.     Conradt Tipped the Inside Information to Weishaus, and Both Conradt and Weishaus Traded on the Basis of the Inside Information.**

57.     Conradt understood that the information that he received from Martin was confidential and that Conradt was not to share it with anyone.  He also understood that Martin should not have shared that information with him.  Notwithstanding, upon each tip by Martin, Conradt immediately tipped the Inside Information to Weishaus.

58.     Beginning on June 24, 2009, Weishaus and Conradt traded on the basis of the Inside Information.  Their trades resulted in illegal profits of $127,485 and $2,533.60, respectively.  Conradt has since disgorged, and Weishaus has been ordered to disgorge, these profits pursuant to the judgments entered against them in the Initial Action.

59.     On April 3, 2013, Conradt pled guilty in the Criminal Proceedings to charges of securities fraud and conspiracy to commit securities fraud.

60.     On December 19, 2013, Weishaus pled guilty in the Criminal Proceedings to charges of securities fraud and conspiracy to commit securities fraud.

11

**F.     Conradt Also Tipped the Inside Information to Payton and Durant.**

61.     At all relevant times, Conradt, Payton, and Durant worked in the Broker's New York City office.  Conradt, Payton, and Durant were friends and communicated regularly.

62.     On November 6, 2007 and January 7, 2009, Payton and Durant, respectively, signed an "Insider Trading Certification" for the Broker, each affirming his knowledge and understanding of policies and procedures regarding insider trading and confirming that he had not traded on any materials "deemed Insider Information."

63.     On or prior to July 1, 2009, Conradt tipped to Payton the Inside Information he had received from Martin.  At about the same time, Conradt learned that that information had also been communicated to Durant, as well as to another registered representative employed by the Broker ("RR").  On July 1, 2009, Conradt exchanged instant messages with Payton, inquiring as to whether Payton had begun to buy SPSS stock:

| | |
|---|---|
| **Conradt:** | did you buy options or the stock for our horse, btw? |
| | it's up today |
| | i wanna buy more |
| **Payton:** | no havent yet, im a d***, been distracted |

64.     This communication was immediately followed by Payton's instant message inquiry of Durant: "u move on the stock yet?", to which Durant replied: "bought a few of the options but just got liquid today.  going to [sic] buying in slowly over this week and next."

65.     On or prior to July 20, 2009, Conradt disclosed to both Durant and Payton the Inside Information, including the names of the parties to the impending transaction, the price, and that the deal would occur soon.

66.     At the time Conradt disclosed this information to Durant and Payton, he also informed them that his friend and roommate had disclosed the information to him.

12

67.     After Conradt's disclosure to him of the Inside Information, on July 20, 2009

Durant placed a limit order to purchase 25 September SPSS call options with a strike price of

$40 in his non-retirement brokerage account ("personal brokerage account"); on July 21, this

order was only partially filled by the purchase of 10 option contracts at his limit price of $.55.

On July 22, 2009, Durant placed a new limit order to purchase 50 September SPSS call options

with a strike price of $40 in his personal brokerage account, raising his limit price to $.60. This

order was fully executed on July 22, 2009.

68.     As used here, a call option is a right to buy 100 shares of a particular stock at a

predetermined price before a preset deadline, in exchange for a premium. For buyers who think

a stock will go up, call options permit a profit from a smaller investment than it would take to

buy a stock.

69.     On July 20 and 22, when Durant sought option contracts to buy 100 shares of

SPSS stock in September at $40 per share, the price per share of SPSS stock closed at prices over

14% less than the option strike price: $33.73 and $34.38, respectively.

70.     On July 22, 2009, when the price per share of SPSS stock closed at $34.38,

Payton purchased 100 August SPSS call options and 50 September SPSS call options, all with a

strike price of $40, in his IRA account at the Broker.

71.     On July 24, 2009, when the price per share of SPSS stock closed at $35.10,

Payton placed orders to purchase 20 September SPSS calls with a strike price of $40 in his IRA

account at the Broker, and 100 August SPSS call options with a strike price of $40 in his

personal trading account at the Broker.

72.     Payton's brokerage account records at the Broker dating back to January 2006

reflect that, prior to July 22, 2009, Payton had not traded in SPSS securities. Moreover, prior to

13

making his SPSS purchases, Payton liquidated his only IRA holding of significant value, using the proceeds to purchase SPSS securities.

73.     After the Announcement, during August and September 2009, Durant and Payton liquidated their SPSS holdings.  The trades of Durant and Payton in SPSS securities that are set forth above resulted in ill-gotten gains exceeding $53,000 and $243,000, respectively.

**G.     Durant and Payton Took Steps to Conceal their Misconduct.**

74.     On July 28, 2009, the day of the Announcement, Conradt, Durant, and RR met for lunch to discuss their trading in SPSS.  During this lunch, the group discussed a meeting planned for later that day, at the Morgan Hotel in New York.  Durant paid for the group's lunch, and did so with cash, discussing with the others his deliberate choice not to use a credit card to avoid leaving a paper trail of the lunch.

75.     That evening, Conradt, Durant, and RR, among others, met with Payton and Weishaus at the Morgan Hotel at 37th Street and Madison Avenue in New York.  Weishaus drove up from Baltimore, Maryland to attend this meeting.  The purpose of the meeting was to discuss Conradt's disclosure of the Inside Information to the participants, the participants' trading in SPSS securities, and what to do if they were contacted by the Commission or other law enforcement about that trading.  At that meeting Payton and Durant, among others, each acknowledged profiting from their trading in SPSS securities.

76.     In early August 2009, Payton transferred all of his holdings, including his SPSS holdings, from accounts held at his employer, the Broker, to another brokerage firm.  In opening accounts at the new firm, he misrepresented himself to be "engaged in real estate consulting," and did not disclose that he was an employee of a securities brokerage firm or affiliated with an exchange member, thereby circumventing any controls that the new firm had in place to, for

14

instance, monitor members of the securities industry and/or to notify his employer, the Broker, of his securities activities.

77.     In November 2009, upon receipt of a Commission subpoena, the Broker placed Payton and Durant in separate rooms and provided them each with a list of questions concerning their trading in SPSS securities. In responding to these questions, Payton and Durant misrepresented the origin of their interest in SPSS securities, and they failed to disclose that Conradt had disclosed to them information about the SPSS Acquisition and that they traded on the basis of material, nonpublic information that they received from Conradt.

78.     On November 6, 2009, the Broker sought further information from Payton and Durant concerning their trades in SPSS. Payton and Durant refused to respond to the additional questions and, on November 10, 2009, the Broker terminated their employment.

**H.     Payton and Durant Each Violated the Federal Securities Laws**.

79.     As detailed above, the Inside Information Conradt tipped to Payton and Durant was material and nonpublic. A reasonable investor would have viewed the Inside Information, and each component thereof, as being important to his or her investment decision.

80.     Based on their history, pattern, or practice of sharing confidences, at the time of the May 2009 lunch and all times subsequent, Martin owed a duty of trust or confidence to Dallas. In breach of this duty of trust or confidence, Martin tipped the Inside Information to his friend and roommate, Conradt, knowing that Conradt could be reasonably expected to trade on the basis of or tip that information.

81.     At all relevant times, Conradt knew or had reason to know that the Inside Information provided to him by Martin had been obtained and transmitted improperly, in breach of a fiduciary duty or duty of trust or confidence.

82.     When Martin tipped the Inside Information to Conradt, Conradt assumed the duty to maintain the confidentiality of that information.  Conradt knowingly or recklessly breached this duty by tipping the Inside Information to his friends and colleagues, Payton and Durant, knowing that they could reasonably be expected to trade on the basis of that information.

83.     Payton and Durant knew or were reckless in not knowing that the Inside Information tipped to them by Conradt was material and nonpublic.

84.     At all relevant times, each of Payton and Durant knew or had reason to know that the Inside Information tipped by Conradt had been initially obtained and transmitted improperly, in breach of a fiduciary duty or duty of trust or confidence.

85.     When Conradt tipped the Inside Information to Payton and Durant, Payton and Durant each assumed a duty to maintain the confidentiality of that information and to not trade. Durant and Payton knowingly or recklessly breached this duty by trading on the basis of, that information.

86.     Payton and Durant, securities industry professionals, knew or were reckless in not knowing that it was a violation of the securities laws to trade on the basis of the Inside Information, or to disclose that information to others.  Notwithstanding, Payton and Durant knowingly or recklessly purchased SPSS securities while in possession, and on the basis of material nonpublic information.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
*(Against Both Defendants)*

87.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1- 86, inclusive, as if they were fully set forth herein.

88.     The Inside Information, and each component thereof, was material and nonpublic.

16

89. At all times relevant to this Complaint, each of the Defendants acted knowingly or recklessly.

90. By engaging in the conduct described above, the Defendants directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

> (a) employed devices, schemes or artifices to defraud;

> (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

> (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

91. By reason of the foregoing, the Defendants violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants Payton and Durant from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Ordering each Defendant to disgorge all ill-gotten gains or unjust enrichment derived

from the activities set forth in this Complaint, together with prejudgment interest thereon;

## III.

Ordering each Defendant to pay civil penalties pursuant to Section 21A of the Exchange

Act [15 U.S.C. § 78u-1]; and

## IV.

Grant such other and further relief as this Court may deem just, equitable, or necessary in

connection with the enforcement of the federal securities laws and for the protection of investors.


Respectfully submitted,


Date:   June 25, 2014

Sharon B. Binger
Catherine E. Pappas

U.S. Securities and Exchange Commission
Securities and Exchange Commission
Philadelphia Regional Office
One Penn Center
1617 JFK Blvd., Ste. 520
Philadelphia, PA  19103
 (215) 597-3100 (Office)
(215) 597-2740 (Fax)
pappasc@sec.gov

**Of Counsel:**
G. Jeffrey Boujoukos
Scott A. Thompson
A. Kristina Littman