```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,     :
                                        :    14 Civ. 4644
        Plaintiff,                      :
                                        :    OPINION AND ORDER
        -v-                             :
                                        :
DARYL M. PAYTON, and                    :
BENJAMIN DURANT, III,                   :
                                        :
        Defendants.                     :
---------------------------------------X
```

JED S. RAKOFF, U.S.D.J.

As a general matter, there is nothing esoteric about insider trading. It is a form of cheating, of using purloined or embezzled information to gain an unfair trading advantage. The Unites States securities markets — the comparative honesty of which is one of our nation's great business assets — cannot tolerate such cheating if those markets are to retain the confidence of investors and the public alike.

But if unlawful insider trading is to be properly deterred, it must be adequately defined. The appropriate body to do so, one would think, is Congress; but in the absence of Congressional action, such definition has been largely left to the courts. This creates difficulties, because courts must proceed on a case-by-case basis. Sometimes those cases are criminal prosecutions, in which circumstance a court is obliged to define unlawful insider trading narrowly, so as to provide

1

the fair notice that due process requires before a person may be placed in jeopardy of imprisonment. Other times those cases are civil proceedings, most often brought by the U.S. Securities and Exchange Commission ("SEC"), in which circumstance a court is inclined to define unlawful insider trading broadly, so as to effectuate the remedial purposes behind the prohibition of such trading.

While the tensions thereby created cannot always be resolved in satisfactory fashion — thus reinforcing the need for Congressional action — they can to some degree be mitigated by focusing on differences of intent. Specifically, while a person is guilty of criminal insider trading only if that person committed the offense "willfully," i.e., knowingly and purposely, a person may be civilly liable if that person committed the offense recklessly, that is, in heedless disregard of the probable consequences. With respect to the motion here pending, that distinction arguably makes a difference.

In this case, the Amended Complaint alleges that the defendants, Daryl Payton and Benjamin Durant, III, unlawfully traded on material nonpublic information regarding IBM's 2009 acquisition of SPSS, Inc. Defendants assert that the recently decided Second Circuit decision, *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), *reh'g denied*, Nos. 13-1837, 13-1917 (2d

Cir. Apr. 3, 2015), requires the Court to dismiss the SEC's Amended Complaint. The SEC responds that the requirements of *Newman* are inapplicable here and that, even if they are applicable, they are here satisfied by the Amended Complaint.

The relevant allegations of the Amended Complaint are as follows.[1] In May 2009, Trent Martin, who was then employed at a registered broker-dealer in New York, acquired material nonpublic information regarding IBM's pending acquisition of SPSS from his close friend, Michael Dallas. Amended Complaint ("Am. Compl.") ¶¶ 1-2, 17, 48. Dallas was an associate at a law firm and had been assigned to work on the SPSS acquisition. *Id.* ¶ 17. Martin and Dallas had a history of sharing confidences such that a duty of trust and confidence existed between them. *Id.* ¶ 30. They each understood that the information they shared about their jobs was nonpublic and both expected the other to maintain confidentiality. *Id.* ¶ 39. In late May 2009, Dallas shared material nonpublic information about the SPSS acquisition with Martin, including information about the anticipated transaction price and the identities of the acquiring and target companies. *Id.* ¶ 48. In June and July 2009, Dallas continued to

---

[1] For purposes of a motion to dismiss, the Court must accept all well-pleaded allegations of fact as true and draws all reasonable inferences in favor of the plaintiff. *SEC v. Apuzzo*, 689 F.3d 204, 207 (2d Cir. 2012).

3

communicate with Martin and share further material nonpublic information about the acquisition. *Id.* ¶ 52.

From October 2008 through November 2009, Martin roomed with Thomas Conradt, a lawyer and registered representative associated with a broker in New York. *Id.* ¶¶ 19, 56. They shared a close, mutually-dependent financial relationship, and had a history of personal favors. *Id.* ¶ 56. Conradt took the lead in organizing and paying shared expenses for the apartment, including paying bills (such as cable, internet, power, and cleaning bills). *Id.* ¶ 57. He negotiated a rent reduction, renegotiated the cable bill for a 25 percent savings, hired a cleaning service, and arranged for apartment repairs. *Id.* ¶ 58. Conradt also assisted Martin after Martin was arrested following a street altercation on June 20, 2009 and charged with criminal assault. *Id.* ¶ 59. Specifically, on June 22, 2009, four days before he traded in SPSS securities, Conradt called a friend who was clerking for a judge to ask for advice on how Martin should deal with the arrest. *Id.* ¶ 60. Dallas, Martin, Conradt, and Conradt's friend then discussed the best legal strategy and potential attorneys to hire for Martin. *Id.*

About the same time, and, in any event, prior to June 24, 2009, Martin, in violation of his duty of trust and confidence to Dallas, tipped inside information about the SPSS acquisition

4

to Conradt. *Id.* ¶ 61. On June 26, 2009, Conradt, on the basis of the information, bought SPSS securities. *Id.* ¶ 62. About a month later, in a conversation following the public announcement of the SPSS acquisition, "Martin thanked Conradt for his prior assistance with the criminal legal matter and told Conradt he was happy that Conradt profited from the SPSS trading because Conradt had helped him." *Id.* ¶ 63.

Two of Conradt's co-workers at the broker-dealer company where Conradt worked were the two defendants here, Payton and Durant. *Id.* ¶ 66. Prior to July 20, 2009, Conradt had spoken with Payton and Durant about his roommate, Martin. *Id.* ¶ 68. The defendants knew Martin worked at a securities firm, and Conradt had told Payton about Martin's assault arrest. *Id.*

Around June 24, 2009, Conradt divulged to another colleague at the firm where he worked — referred to in the Amended Complaint as Registered Representative #1 ("RR1") — the inside information about the SPSS acquisition. *Id.* ¶ 69. Around July 1, 2009, Conradt learned that RR1 had, in turn, shared the inside information with defendants Payton and Durant. *Id.* ¶ 70. Conradt then personally told the defendants that his roommate Martin had told him about the SPSS acquisition. *Id.* "Knowing that Conradt was Martin's roommate," Payton and Durant did not ask why Martin

5

told Conradt, and they did not ask how Martin learned the information. *Id.*

On the basis of the inside information they learned from RR1 and Conradt, defendants purchased SPSS securities. *Id.* ¶¶ 75, 77. On July 28, 2009, the day of the public announcement, Conradt, defendant Durant, and RR1 met for lunch to discuss their trading in SPSS. *Id.* ¶ 81. They planned a further meeting at a hotel that evening, and Durant paid for the lunch in cash, stating he did not want to leave a paper record. *Id.* That evening, Conradt, defendant Payton, defendant Durant, RR1, and another individual tipped by Conradt, David Weishaus, met at a hotel to discuss what they should do if any of them were contacted by the SEC or other law enforcement. *Id.* ¶ 82. They agreed not to discuss the trading with anyone and to contact a lawyer if questioned. *Id.*

In August 2009, Payton transferred all his holdings from accounts held by his employer to another firm. *Id.* ¶ 83. In order to avoid controls that that firm had in place for monitoring members of the securities industry, Payton falsely represented to that firm that he was engaged in real estate consulting. *Id.* In November, upon receipt of an SEC subpoena, the defendants' employer placed the defendants in separate rooms and questioned them about their SPSS trading, at which time both

defendants lied about the origin of their interest in SPSS securities. *Id.* ¶ 84.

On the basis of the foregoing allegations, the SEC charges the defendants with violating the general antifraud provisions of the securities laws — specifically, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder — by engaging in insider trading. As noted earlier, the law on insider trading has been largely developed by the courts and basically rests on two legal theories. Under the "classical" theory, an insider who, in breach of his fiduciary duty to his company or its shareholders, either trades for himself on the basis of his company's material nonpublic information or provides the information to an outsider (the "tippee") in return for some personal benefit, thereby defrauds his company and its shareholders, as does a co-schemer such as the tippee. Under the "misappropriation" theory, an outsider (i.e., not part of the company whose stock is to be traded) who embezzles material nonpublic information from his employer or other source of information in breach of a duty owed to the source of the information and then either trades on it or, in return for a benefit, provides it for trading purposes to a tippee, thereby defrauds the source, as does a co-schemer such as the tippee.

Problems arise, however, when applying these theories to trading on such information by so-called remote tippees, that is, persons other than the immediate tippee. Since there are legitimate reasons why an insider might disclose inside information to an outsider — e.g., a whistleblower disclosing a fraud, or simply an executive carrying out his company's policy of "priming the market" by making disclosures to analysts before a public announcement — the Supreme Court long ago determined that no fraud has occurred in the classical situation unless the insider is receiving a personal benefit for disclosing the information. *Dirks v. SEC*, 463 U.S. 646, 662 (1983). Accordingly, in *Newman*, a case against a remote tippee premised on the classical theory of insider trading, the Second Circuit held that the remote tippee, in order to be criminally liable, had to be aware that the original tipper had received a benefit for disclosing the inside information, for otherwise the remote tippee would not know whether he was participating in a fraud or not.

Specifically, the Court in *Newman* stated that a tippee (whether immediate or remote) could, under the classical theory, only be prosecuted for trading on inside information where the following elements were proved:

> (1) the corporate insider was entrusted with a fiduciary duty; (2) the corporate insider breached his

8

> fiduciary duty by (a) disclosing confidential information to a tippee (b) in exchange for a personal benefit; (3) **the tippee knew of the tipper's breach**, that is, he knew the information was confidential and divulged for personal benefit; and (4) the tippee still used that information to trade in a security or tip another individual for personal benefit.

*Newman*, 773 F.3d at 450.

The SEC argues that a distinction from these requirements should be made when it comes to a remote tippee of inside information that was obtained by misappropriation, because (in contrast to disclosure by an insider) it is difficult to imagine any legitimate justification for disclosure of material nonpublic information by an outsider, who is not part of the company whose stock is traded but has been entrusted with confidential information about the company by way of a duty of trust and confidence to the source of the information. Therefore, the argument goes, a remote tippee's knowledge that the inside information emanated from an act of misappropriation should be sufficient to charge the remote tippee, for it is the equivalent of knowledge that the tippee is the knowing recipient of stolen property.

Whatever the abstract merits of this argument, the Second Circuit, in *Newman*, stated unequivocally that "[t]he elements of tipping liability are the same, regardless of whether the tipper's duty arises under the 'classical' or the

9

'misappropriation' theory." *Newman*, 773 F.3d at 446. *Newman* then set forth the standard quoted above, requiring both benefit to the tipper and the tippee's knowledge of the benefit. *Id.* at 450. While a purist might regard these statements as dicta — since they were not technically necessary to the resolution of the case in *Newman*, which involved a classical theory of insider trading — nonetheless, these statements seem so clearly intended to give guidance to the lower courts of this Circuit that this Court takes them as binding.

On that basis, the defendants then assert that the Amended Complaint must be dismissed because, they argue, it fails to adequately allege either that the original tipper, here Trent Martin, received a personal benefit for disclosing information to his immediate tippee, Thomas Conradt, or that the defendants had knowledge of that personal benefit.

In *Dirks*, a civil case, the Supreme Court defined a personal benefit as

> a pecuniary gain or a reputational benefit that will translate into future earnings. . . . For example, there may be a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the particular recipient. *The elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend.*

10

*Dirks*, 463 U.S. at 663-64 (emphasis supplied). It is arguably unclear whether the italicized sentence modifies the prior reference to "pecuniary gain or . . . future earnings," or is an independent, stand-alone possibility. However, in *Newman*, a criminal case, the Second Circuit held that, to the extent *Dirks* suggests that a benefit may be inferred from a personal relationship, "such an inference is impermissible in the absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." 773 F.3d at 452. Whether this is the required reading of *Dirks* may not be obvious,[2] and it may not be so easy for a lower court, which is bound to follow both decisions, to reconcile the two. Nevertheless, the Court need not confront that difficulty here, for it concludes that, for purposes of this SEC civil enforcement action, the Amended Complaint adequately meets any definition of "benefit" set forth in either *Dirks* or *Newman*.

---

[2] *Dirks* states that there are "objective facts and circumstances that often justify such an inference [of personal benefit]" and then lists a number of different relationship-types as examples. *Dirks*, 463 U.S. at 664. In listing them as examples, the *Dirks* decision seems to distinguish a *quid pro quo* relationship from instances where an insider makes a "gift" of confidential information to a relative or friend; whereas, the *Newman* decision suggests that the latter type of relationship (i.e. mere friendship) can lead to an inference of personal benefit only where there is evidence that it is generally akin to *quid pro quo*. Compare *id.*, with *Newman*, 773 F.3d at 452.

11

Specifically, applying the more onerous standard of benefit set forth in *Newman*, the first issue is whether the SEC has sufficiently alleged that Martin, the tipper, received a personal benefit for disclosing material nonpublic information about the SPSS acquisition to Conradt.[3] The Amended Complaint alleges that Martin and Conradt "shared a close mutually-dependent financial relationship, and had a history of personal favors." Am. Compl. ¶ 56. To substantiate this otherwise conclusory statement, the SEC alleges that their expenses were "intertwined," that Conradt took the lead in organizing and initially paying their shared expenses, and that he negotiated reductions in their utilities and rent payments. *Id.* ¶¶ 57-58. Even more importantly, Conradt assisted Martin with a criminal legal matter that threatened Martin's ability to remain legally in the United States, *id.* ¶ 59, and subsequently, "Martin thanked Conradt for his prior assistance with the criminal legal

---

[3] Because allegations of insider trading sound in fraud, the complaint is generally subject to the heightened pleading standards of Fed. R. Civ. P. 9(b). *See Newman*, 773 F.3d at 445 ("[I]nsider trading is a type of securities fraud."); *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 484 (S.D.N.Y. 2007). However, the SEC asserts that the standards under Rule 9(b) are relaxed in the context of insider trading "because insider tips are typically passed on in secret" and "it is often impractical to require plaintiffs to allege these details with particularity." *SEC v. One or more Unknown Traders in Securities of Onyx Pharma., Inc.*, No. 13 Civ. 4645, 2014 WL 5026153, at *4 (S.D.N.Y. Sept. 29, 2014). This Court finds that where matters are "peculiarly within the [defendants'] knowledge," slightly relaxed pleading standards are appropriate. *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972). However, where the facts alleged are not within defendants' knowledge, the Court will apply the usual standard set forth under Rule 9(b).

12

matter and told Conradt he was happy that Conradt profited from the SPSS trading because Conradt had helped him." *Id.* ¶ 63. Although this conversation occurred more than a month after the insider trading in question, the Court, drawing (as required) every reasonable inference in plaintiff's favor, finds that it is indicative Martin's intent to benefit Conradt at the time of disclosure of the information, as well as evidence of a *quid pro quo* relationship. *See Newman*, 773 F.3d at 452; *see also United States v. Riley*, No. 13 Cr. 339-1, 2015 WL 891675, at *5 (S.D.N.Y. Mar. 3, 2015) ("If a tip maintains or furthers a friendship, and is not simply incidental to the friendship, that is circumstantial evidence that the friendship is a *quid pro quo* relationship."). More generally, taking all the facts in the complaint as true and drawing all reasonable inferences in favor of the SEC, the Amended Complaint more than sufficiently alleges that Martin and Conradt had a meaningfully close personal relationship and that Martin disclosed the inside information for a personal benefit sufficient to satisfy the *Newman* standard. *See Newman*, 773 F.3d at 452.

The Amended Complaint also alleges that the defendants had knowledge of a benefit sufficient to meet the civil standard of "knowing or reckless." While there is no allegation that the defendants knew specifically about Conradt's help to Martin on

13

the criminal charge, the Amended Complaint does allege, *inter alia*, that the defendants (a) knew that Martin was the source of the tip to Conradt, Am. Compl. ¶ 69-74; (b) knew that Conradt and Martin were friends and roommates, *id.* ¶ 68; and (c) knew (at least in the case of defendant Payton) of Martin's assault arrest, *id.* This is enough to raise the reasonable inference that the defendants knew that Martin's relationship with Conradt involved reciprocal benefits.

Furthermore, defendant Durant repeatedly asked Conradt if Martin had given him any more information, *id.* ¶ 74, indicating that he knew that Conradt and Martin had a close enough relationship that they would continue to exchange inside information about the SPSS acquisition. And Conradt, for his part, continued to provide defendants with more specific information about the acquisition, including reassurance as to its validity, the names of the parties to the transaction, that the transaction would happen soon, and that the information came from Conradt's roommate, Martin. *Id.* ¶ 74.

Further still, in contrast to the facts in *Newman*, where the defendants "knew next to nothing" about the tippers, were unaware of the circumstances of how the information was obtained, and "did not know what the relationship between the [tipper] and the first-level tippee was," 773 F.3d at 453-54,

14

the Amended Complaint here alleges that the defendants knew the basic circumstances surrounding the tip. It further alleges that the defendants recklessly avoided discovering additional details. Despite their market sophistication and their knowledge that Conradt learned the information from Martin, they did not ask Conradt why Martin shared the inside information or how Martin learned of it in the first place. *Id.* ¶ 70. The Court may draw an adverse inference from their conscious avoidance of details about the source of the inside information and nature of the initial disclosure. *SEC v. Obus*, 693 F.3d 276, 288-89 (2d Cir. 2012) ("[T]ippee liability may also result from conscious avoidance."); *SEC v. Musella*, 678 F. Supp. 1060, 1063 (S.D.N.Y. 1988) (finding that downstream tippees should have known about a breach of a duty, but that they "did not ask [about the source of information] because they did not want to know").

As further evidence of defendants' knowledge that the inside information was the product of a breach of duty, defendants took multiple steps to conceal their own trading in SPSS securities. Defendant Durant avoided leaving a paper trail at a lunch meeting with Conradt, *id.* ¶ 81; defendants met with other tippees and agreed not to discuss their trading with anyone else, *id.* ¶ 82; defendant Payton transferred his holdings, including his SPSS holdings, that were held with his

15

employer to another brokerage firm and misrepresented himself to be engaged in real estate consulting to avoid any controls the new firm may have had in place for monitoring members of the security industry, *id.* ¶ 83; and, when questioned, defendants lied to their employer about the origins of their interest in SPSS securities, *id.* ¶ 84.

Thus, taking these allegations as true and drawing all reasonable inferences in favor of the SEC, the Amended Complaint more than sufficiently alleges that defendants knew or recklessly disregarded that Martin received a personal benefit in disclosing information to Conradt, and that Martin in doing so breached a duty of trust and confidence to the owner of the information. *Newman*, 773 F.3d at 450.

Accordingly, for the foregoing reasons, defendants' motion to dismiss the Amended Complaint is hereby denied. The Clerk of the Court is directed to close docket number 28.

SO ORDERED.

Dated:   New York, NY
         April 6, 2015

_____
JED S. RAKOFF, U.S.D.J.