UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION

        Plaintiff,

        v.

DARYL M. PAYTON and BENJAMIN
DURANT III,

        Defendants.

14 Civ. 4644 (JSR)

**ECF CASE**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MORVILLO LLP
One World Financial Center
27th Floor
New York, New York 10281
Tel.:  (212) 796-6330

Gregory Morvillo
E. Scott Morvillo

*Counsel for Benjamin Durant III*

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel.:  (212) 909-6000

Matthew E. Fishbein
Sean Hecker
Rushmi Bhaskaran
Noam Greenspan

DEBEVOISE & PLIMPTON LLP
555 13th Street, N.W.
Washington, D.C. 20004
Tel.:  (202) 383-8000

Jonathan R. Tuttle
Ada Fernandez Johnson

*Counsel for Daryl M. Payton*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 3

    A.    Dallas Leaks Confidential Information To Martin. ...................................................... 3

    B.    Martin's And Conradt's Unremarkable Living Situation ............................................. 5

    C.    Martin Discloses The SPSS Information To Conradt To Get Conradt's Views
        On The Propriety Of His Trades. ................................................................................ 8

    D.    Martin Is Arrested and Rejects The Lawyers' Names Conradt Offers Him. ............... 8

    E.    Martin Updates Conradt About SPSS. ....................................................................... 9

    F.    Martin Turns To Dallas For Advice. ........................................................................ 11

    G.    The SPSS Acquisition Is Announced. ...................................................................... 12

    H.    Dallas Lies To His Employer And Encourages Martin To Leave The United
        States. ....................................................................................................................... 13

ARGUMENT .................................................................................................................. 14

I.        STANDARD OF REVIEW ..................................................................................... 14

II.       PAYTON AND DURANT DID NOT COMMIT INSIDER TRADING .................... 14

    A.    Martin Did Not Disclose The Confidential SPSS information For A Personal
        Benefit ..................................................................................................................... 16

        1.    Martin And Conradt Were Not Close ................................................................. 16

        2.    There Is No Quid Pro Quo. ................................................................................. 17

        3.    Martin Did Not Intend To Benefit Conradt With A Gift Of Confidential
            Information. ....................................................................................................... 18

    B.    Payton And Durant Did Not Know, And Had No Reason To Know, About Any
        Personal Benefit To Martin. ..................................................................................... 19

    C.    Martin Did Not Breach Any Duty Of Trust Or Confidence Between Him And
        Dallas. ...................................................................................................................... 22

III.      CONCLUSION ....................................................................................................... 25

i

# **TABLE OF AUTHORITIES**

CASES

Chiarella v. United States, 445 U.S. 222, 100 S Ct. 1108 (1980)................................................21

Dirks v. SEC, 463 U.S. 646, 103 S. Ct. 3255 (1983)........................................... *passim*

Gordon v. Sonar Capital Mgmt LLC, et al., No. 11 Civ. 9665 (JSR), 2015 WL 4554194
  (S.D.N.Y. July 30, 2015) ........................................................................... *passim*

In re Millenial Media, Inc. Securities Litig., No. 14 Civ. 7923(PAE), 2015 WL 3443918
  (S.D.N.Y. May 29, 2015)..........................................................................10

Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005)..........................................22

Quick v. Quinn, No. 12 Civ. 1529 (DNH) (DEP), No. 2014 WL 4627106 (N.D.N.Y.
  Sept. 11, 2014) .......................................................................................22

Robinson v. Concentra Health Servs. Inc., 781 F.3d 42 (2d Cir. 2015) .......................14

Schmidt v. Tremmel, No. 93 Civ. 8588 (JSM), 1995 WL 6250 (S.D.N.Y. Jan. 6, 1995)............22

Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769 (2007).........................................14, 25

SEC v. Downe, 969 F. Supp. 149 (S.D.N.Y. 1997)..............................................17

SEC v. Maio, 51 F.3d 623 (7th Cir. 1995).......................................................17

SEC v. Obus, 693 F.3d 276 (2d Cir. 2012).......................................................16

SEC v. Payton, No. 14 Civ. 4644 (JSR), 2015 WL 1438454 (S.D.N.Y. April 6, 2015) ............14

SEC v. Sargent, 229 F.3d 68 (1st Cir. 2000) ....................................................18

SEC v. Warde, 151 F.3d 42 (2d Cir. 1998).......................................................17

United States v. Evans, 486 F.3d 315 (7th Cir. 2007) ..........................................17

United States v. Gupta, 11 Cr. 907 (JSR), 2015 WL 4036158 (S.D.N.Y. July 2, 2015).........16, 20

United States v. Jiau, 734 F.3d 147 ............................................................15, 18

United States v. Newman, 773 F.3d 438 (2d Cir. 2014).................................... *passim*

United States v. Riley, 13 Cr.339 (VEC), 2015 WL 891675 (S.D.N.Y. March 3, 2015)..............18

United States v. Salman, No. 14-10204, 2015 WL 4068903 (9th Cir. 2015)..............16

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ...........................................................................................................1, 14

17 C.F.R. § 240.10b5-2(b) ........................................................................................................15

Daryl M. Payton and Benjamin Durant III (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion pursuant to Fed. R. Civ. P. 56(a) for summary judgment in their favor.

## PRELIMINARY STATEMENT

Prior to filing its Amended Complaint, the SEC participated in a robust, three-year investigation into the Defendants' trades in SPSS preceding its acquisition by IBM. The SEC had access to hundreds of thousands of documents, detailed notes of numerous interviews of the key witnesses, and unfettered access to, on its theory of the case, the alleged tipper (Trent Martin) and direct tippee (Thomas Conradt), both of whom signed cooperation agreements with the SEC.

In the wake of United States v. Newman, 773 F.3d 438 (2d Cir. 2014), the SEC amended its complaint to address pleading deficiencies with respect to personal benefit and knowledge thereof, and alleged that Conradt provided Martin with personal benefits in exchange for material, nonpublic information concerning IBM's acquisition of SPSS. In defending against Defendants' Motion to Dismiss, the SEC asked this Court to draw every reasonable inference in its favor with respect to whether Conradt and Martin exchanged any personal benefit for the SPSS tips. It did so notwithstanding that it should have known—and could have learned simply by asking its cooperating witnesses, Martin and Conradt, the obvious question—that many of the inferences it asked this Court to draw were wrong.

Discovery has now exposed inexcusable flaws in the SEC's case, and the SEC's apparent failure to verify with its own cooperating witnesses whether its newly minted allegations were true. Pages and pages of deposition testimony demonstrate that Martin received no personal benefit from Conradt (or anyone else) in exchange for tipping him information about the SPSS transaction, and that Defendants certainly had no knowledge of, or any reason to know of, any

benefit. It further reveals that Michael Dallas, the Cravath Swaine & Moore LLP ("Cravath") associate who disclosed the non-public information about the SPSS deal to Martin, could not have had any expectation that Martin would not trade, undermining the core theory of the SEC's case that Martin allegedly breached a duty of confidence to Dallas. As such, Payton and Durant are not liable for committing insider trading and this Court should, given the absence of genuinely disputed material facts, grant summary judgment for Defendants.

To start, the SEC's beleaguered theory of personal benefit fails as a matter of law. The SEC's own cooperating witnesses denied in unambiguous language any suggestion that Martin received a personal benefit from Conradt in exchange for the tip. They each testified that they were hardly friends, did not depend on each other financially, and had no history of trading personal favors. In fact, the undisputed facts suggest the exact opposite: Conradt cheated Martin financially. Furthermore, with respect to each alleged favor that the SEC claims Conradt did in exchange for the SPSS information, Conradt did each for his own benefit, not Martin's. Martin similarly rejected any notion that he exchanged the SPSS information for the alleged apartment-related repairs and chores or for Conradt's efforts to provide a lawyer's name after Martin was arrested. Instead, Martin testified that he mentioned SPSS to Conradt because Conradt was literally nearby in the apartment and because Martin wanted Conradt's assessment of whether trading on SPSS would be problematic. These facts are uncontroverted in the testimony, and they fall woefully short of the personal benefit standard established in Dirks v. SEC, 463 U.S. 646, 103 S. Ct. 3255 (1983), and restated in Newman.

Even assuming that the SEC's flawed personal benefit theory could survive summary judgment, the SEC's case still fails because the SEC has elicited no evidence whatsoever that Payton or Durant knew or had reason to know about any benefit. While Payton knew that

Conradt's information came from a person named "Trent" and Durant from one of Conradt's "friends," they both knew absolutely nothing about the circumstances of Conradt's and Martin's relationship, or even that they were roommates. Nor is there any evidence that suggests that Defendants knew or had reason to know that anyone (Martin or Dallas) had improperly transmitted SPSS information. For this reason alone, this case should not stand.

The deficiencies in the SEC's case do not end there. From the beginning, its case has been premised on the notion that Dallas did not intend Martin to trade and as such, was a victim of Martin's deceit. But just days after Dallas disclosed the SPSS information to Martin, Martin sent Dallas a text message where he stated that he was going to trade in SPSS. Discovery has also revealed that Dallas disclosed his clients' confidential information to Martin on numerous occasions, and did so *even after* he learned the details of Martin's trading SPSS common stock and options. On these facts, for which there is no material issue in genuine dispute, no rational trier of fact could conclude that Dallas had an expectation that Martin would refrain from trading and that Martin breached a duty of confidence by passing the information on to Conradt.

## STATEMENT OF FACTS

A.   <u>Dallas Leaks Confidential Information To Martin.</u>

In September 2008, Dallas joined Cravath in New York after practicing law in New Zealand for three to four years. Ex. 1, Dallas Tr. 11:15–14:4;[1] Statement of Undisputed Material Facts Pursuant to Rule 56.1 (hereinafter "56.1") ¶ 1. As a member of its mergers and acquisition ("M&A") practice, Dallas learned confidential information concerning numerous transactions. He understood that his ethical obligations as an attorney and Cravath's internal policies

---

[1]   Exhibits 1 through 5 are exhibits to the Declaration of Rushmi Bhaskaran.

prohibited him from disclosing that information to anyone unaffiliated with the firm. Ex. 1, Dallas Tr. 72:5–73:2; 83:17–86:6; 184:5–184:8; 56.1 ¶¶ 2–3. Those ethical and legal obligations did not, however, stop Dallas from divulging client information to Martin on multiple occasions. See e.g., Ex. 1, Dallas Tr. 50:11–51:15; 57:11–58:10; 79:20–23; 158:20–23; 56.1 ¶ 4. Indeed, Dallas divulged information regarding each of the first four deals he worked on as an M&A associate.

After Dallas moved to New York, he became close friends with Martin, an equities salesman employed at The Royal Bank of Scotland ("RBS"), and with other Australian friends of Martin's who lived in New York. Dallas and Martin frequently socialized as part of a group, and occasionally socialized one-on-one. Ex. 2, Martin Tr. 42:6–21; Ex. 1, Dallas Tr. 19:19–20:4; 56.1 ¶¶ 5–6.

Dallas could not always keep up with his social calendar due to work demands, and occasionally canceled or postponed gatherings with Martin. Rather than canceling by explaining he had to work late, Dallas apparently felt it was necessary to disclose details of the deals on which he worked. Ex.1, Dallas Tr. 50:11–51:25 (informing Martin on March 6, 2009 that he would be late because Roche "upped the genentech bid."); Ex.1, Dallas Tr. 57:11–60:1 (asking Martin to host one of Dallas's friends on May 14, 2009 because "Pepsi is probably going to go hostile to buy two bottling subs it already has a stake in"); 56.1 ¶ 7.

On May 29 or 30, 2009, Martin and Dallas met for lunch. Dallas revealed he had been assigned to work on IBM's acquisition of SPSS and that he was experiencing stress about working on the deal. Ex. 1, Dallas Tr. 79:20–80:24; Ex.2, Martin Tr. 50:10–14; 56.1 ¶ 8. But Dallas did not simply unburden himself as to his emotional state. He also unburdened himself of the fact that IBM hoped to acquire SPSS at $50 per share in an all-cash offer. Ex. 2, Martin Tr.

47:10–49:17; Ex. 1, Dallas Tr. 79:20–23; 56.1 ¶ 9. Dallas did not ask Martin to keep the SPSS

information confidential and did not ask Martin not to trade on it. Ex.2, Martin Tr. 47:6–9; Ex. 1,

Dallas Tr. 82:2–12; 56.1 ¶ 10. Indeed, Martin left the lunch believing that Dallas *expected* him to

trade on the SPSS information. He later testified that he could imagine no other explanation for

Dallas disclosing that level of detail regarding the SPSS transaction. Ex. 2, Martin Tr. 56:22–

57:17.[2] To the extent that Dallas and Martin left lunch with different impressions as to whether

Dallas expected Martin not to trade, Martin cleared it up within days. On Monday, June 1, 2009,

Martin texted Dallas, "I'm going to hit that stock I reckon." Fishbein Decl, Ex. A; 56.1 ¶ 11.[3]

Martin has explained to the SEC that this text could have only referred to SPSS because it was

the only stock they were discussing at the time.[4] Fishbein Decl, ¶ 5. Just two days after sending

his text message, Martin bought SPSS stock. Ex. 2, Martin Tr. 101:20–25; 56.1 ¶ 13.

## B.   Martin's And Conradt's Unremarkable Living Situation

At the time Dallas leaked the SPSS information to Martin, Martin lived in an apartment

with Conradt, a broker at EuroPacific Capital ("EuroPacific") who had attended law school, and

a third roommate. Martin moved into that apartment in October 2008, after responding to a

---

[2]   Cf. Amended Complaint ("AC"), ¶ 50 ("Based on their history of sharing and maintaining
      confidences, Dallas expected Martin to maintain the information that Dallas disclosed to him
      about the SPSS Acquisition in confidence.").

[3]   Defendants only discovered the June 1st text message after the depositions of Martin and
      Dallas and were therefore not able to ask them about the text.  On August 13, 2015, the
      Court granted Defendants' motion to reopen Martin's and Dallas's depositions for the
      limited purpose of testimony about the text.  This testimony will be included in Defendants'
      reply brief, and Defendants expect Martin will testify consistently with what he told the
      SEC, as described in the Fishbein Declaration.  Defendants also expect that Dallas will
      testify that he does not remember receiving the text.

[4]   Fifteen minutes later, Dallas replied to the text message, stating:  "Will call you tonight
      about the coming weekend, talk soon."  Fishbein Decl, Ex. A; 56.1 ¶ 12.

5

Craigslist advertisement. Prior to moving into the apartment, Martin and Conradt had never met. Ex. 3, Conradt Tr. 76:4–5; Ex.2, Martin Tr. 10:9–16; 56.1 ¶ 14.

Over the nine-month period from October 2008 to June 2009, Conradt and Martin became friendly within the apartment, but they never became "close." Ex. 3, Conradt Tr. 109:15–111:17; Ex. 2, Martin. 14:4–13; 56.1 ¶ 15. Martin and Conradt occasionally watched television together, drank beers and ate takeout. Ex. 3, Conradt Tr. 109:15–111:25; Ex. 2, Martin Tr. 12:14–13:11, 14:4–14:13; 56.1 ¶ 16. Outside the apartment, they infrequently went to "a couple of happy hours" and played basketball together. Ex. 3, Conradt Tr. 54:15–55:1; Ex. 2, Martin, Tr. 12:14–13:11; 56.1 ¶¶ 16–17. Their relationship was defined more by what they did not do and know than by what they did. They did not: share details about one another's work, meet one another's families, meet their respective friends, visit each other at work, or meet each other's co-workers. Ex. 3, Conradt Tr. 40:3–40:9, 109:15–110:5, 204:11–19; Ex. 2, Martin Tr. 13:12–14:3; 56.1 ¶ 18. Tellingly, when Martin threw himself a 30th birthday party, Conradt was not invited. Ex. 1, Dallas Tr. 121:14–122:8; 56.1 ¶ 19.

Despite their "friendly" relationship, Conradt and the third roommate took advantage of Martin financially: unbeknownst to Martin, Conradt and the third roommate charged Martin more than half of the apartment's overall rent for the first eight months they lived together. Ex. 3, Conradt Tr. 76:14–77:3, 93:22–95:23; 56.1 ¶ 20. Only when Conradt informed Martin that he (Conradt) had negotiated a reduction in the overall rent—which Conradt testified was undertaken for his own benefit—did Martin discover that he was "subsidizing" Conradt and the third roommate's rent. Ex. 3, Conradt Tr. 93:22–94:24, 108:16–109:14, 208:10–208:17; 56.1 ¶ 21. In the spirit of "mak[ing] it a bit more equitable" and in order to stop "actively taking advantage of" Martin, Conradt and the third roommate reduced Martin's share of the rent. Ex. 3, Conradt Tr.

208:18–209:9; 56.1 ¶ 22. Nevertheless, when Conradt moved out of the apartment in late 2009, he stuck Martin with an unpaid rent bill—quite inconsistent with the way one would treat a close friend. Ex. 1, Dallas Tr. 122:18–123:5; 56.1 ¶ 23.

Martin frequently traveled and spent weekends away from their apartment, while the third roommate often stayed with his girlfriend. Ex. 2, Martin Tr. 12:14–24, 15:05–15:10; Ex. 3, Conradt Tr. 39:1–7; 56.1 ¶ 24. Conradt, on the other hand, spent lots of time in the apartment, in part because he was unable to work as a broker while he studied at home for his required examinations in February 2009. Ex. 3, Conradt Tr. 37:2–13, 77:17–25; 56.1 ¶ 25. Conradt arranged for various apartment repairs and chores that had a direct bearing on his own enjoyment of the apartment. For example, he demanded that the landlord fix (1) the roof that was leaking right next to his bedroom, (2) a shared bathroom door that he found "annoying" because it would not close, and (3) a broken door buzzer that Conradt felt was "a pain" because it made it difficult to let in guests. Ex. 3, Conradt Tr. 82:4–85:6; 56.1 ¶ 26. Conradt also (1) replaced a shower head, which he thought "suck[ed]," with a new one; (2) had an "eyesore" of a truck moved from the front of the apartment; and (3) arranged for a cleaning person to placate his girlfriend. Ex. 3, Conradt Tr. 87:3–88:1, 98:16–99:1, 96:21–97:3; 56.1 ¶ 27. Conradt testified that he performed these chores for his *own* benefit and *did not view them as favors to his roommates*. Ex. 3, Conradt Tr. 206:21–207:23; 56.1 ¶ 28.[5]

---

[5]     Cf. AC ¶ 56 ("From October 2008 until November 2009, Martin and Conradt were friends and roommates in a New York City apartment, shared a close mutually-dependent financial relationship, and had a history of personal favors.").

C.      Martin Discloses The SPSS Information To Conradt To Get Conradt's Views On
        The Propriety Of His Trades.

In mid-June, after Martin had already traded, Martin shared SPSS information with
Conradt, but Martin did not disclose anything about its source. Ex. 2, Martin Tr. 20:11–24; Ex. 3,
Conradt Tr. 117:5– 10; 56.1 ¶ 29. As Martin testified, he told Conradt about the transaction
because he wanted to talk to someone about the appropriateness of his trades and Conradt
happened to be around and had gone to law school; ex. 2, Martin Tr. 17:11–19:13; 21:23–22:14;
56.1 ¶ 30. Martin testified that he did not provide the SPSS information in exchange for any
benefit that he had received or expected to receive from Conradt. Ex. 2, Martin Tr. 22:15–23:14;
56.1 ¶ 31. Likewise, Conradt testified that he did not believe that Martin provided him with the
SPSS information in exchange for Conradt's household chores, or in exchange for any other
benefit. Ex. 3, Conradt Tr. 209:19–210:18; 56.1 ¶ 32.

D.      Martin Is Arrested and Rejects The Lawyers' Names Conradt Offers Him.

On June 20, 2009—*after* Martin disclosed the SPSS information to Conradt—Martin was
arrested. Intoxicated after a day of drinking, Martin ran past a woman who was holding a water
bottle, grabbed it, and sprayed water on his face as if he were a marathon runner. Ex. 2, Martin
Tr. 186:23–187:18; Ex. 3, Conradt Tr. 101:5–102:14; 56.1 ¶ 33. The woman's friend threatened
to call the police, and Martin grabbed the friend's phone and threw it down. Ex. 2, Martin Tr.
186:23–187:18; Ex. 3, Conradt Tr. 101:5–102:14; 56.1 ¶ 34. Nearby police saw the incident and
arrested Martin for destruction of property. Ex. 2, Martin Tr. 187:4–187:18; 56.1 ¶ 35.

The next day, Martin discussed his arrest with Conradt and Dallas, two people with legal
backgrounds in closest proximity to him. Ex. 2, Martin Tr. 186:23–188:06; Ex. 3, Conradt Tr.
100:9–102:21; Ex. 1, Dallas Tr. 33:23–34:11; 56.1 ¶ 36. Conradt asked a friend serving as a
judge's law clerk in Atlantic City for attorney recommendations, which Conradt forwarded to

Martin. Ex. 2, Martin Tr. 188:07–15; Ex. 3, Conradt Tr. 26:2–17; 56.1 ¶ 37. Martin rejected

Conradt's recommendations, ultimately selecting a lawyer recommended by a close friend. Ex. 2,

Martin Tr. 188:16–189:22; Ex. 3, Conradt Tr. 226:9–20; 56.1 ¶ 38. Both Martin and Conradt

testified that Martin's disclosure of the SPSS information to Conradt was not in exchange for, or

even remotely connected to, the attorney recommendation, which is not surprising since the tip

came weeks before Martin's arrest. Ex. 2, Martin, Tr. 39:20–41:9; Tr. 80:18–84:2; Ex. 3,

Conradt Tr. 226:9–227:8; 56.1 ¶ 39.[6]

     Conradt found Martin's arrest "hilarious," and recounted it to Payton and other

colleagues. Ex. 3, Conradt Tr. 197:5–22; Ex. 4, Payton Tr. 132:19– 135:25; 56.1 ¶ 40. Conradt

did not, however, mention the "assistance" he offered Martin in connection with Martin's arrest.

Ex. 4, Payton Tr. 152:13–152:18; 56.1 ¶ 41.

     E.    <u>Martin Updates Conradt About SPSS.</u>

     Martin testified that, prior to the IBM/SPSS merger announcement on July 27, 2009, he

received additional SPSS information from Dallas concerning the acquisition, including the

expected price and time frame for the deal's announcement. Ex. 2, Martin, Tr. 131:22–132:22;

56.1 ¶ 42. Although Dallas purported not to recall this subsequent conversation, he could not

identify any other source of the additional SPSS details known by Martin, and ultimately

acknowledged that Martin could have only gotten that information from him. Ex. 1, Dallas Tr.

138:9–139:5; 90:24–91:24 ("I suspected that the information could only be traced to me.").

---

[6]  <u>Cf</u>. ECF Dkt. No. 37, SEC's Sur-Reply In Opposition To Defendants' Motion to Dismiss, at
3 ("Regardless of when Martin first told Conradt about SPSS the facts support the inference
that Martin connected the SPSS tip with Conradt's assistance.").

In two or three conversations, Martin shared with Conradt the additional SPSS information he received from Dallas. Martin and Conradt discussed the parties to the transaction, the price of the deal, and the imminence of the deal's announcement. Ex. 2, Martin Tr. 202:18–203:13; Ex. 3, Conradt Tr. 112:9–115:1; 125:2–126:9; 154:11–157:1; 166:14–167:4; 56.1 ¶ 42. Conradt testified that neither he nor Martin raised the rent reduction, the apartment repairs or cleaning service, or Conradt's attempts to secure lawyers' names after Martin's arrest. Ex. 3, Conradt Tr. 209:23–210:18; 213:2–23; 215:4–216:11. Likewise, Martin confirmed that he did not provide the SPSS information in exchange for Conradt's completing household repairs or securing a rent reduction, or anything else. Ex. 2, Martin Tr. 22:15–23:14, 133:22–134:16.[7]

In a series of conversations, Conradt provided the SPSS information to close friends David Weishaus and Matthew Lehrer, both of whom worked at EuroPacific. Ex. 3, Conradt Tr. 121:8–123:9; 56.1 ¶ 43. When Conradt discovered that Lehrer had mentioned the SPSS

---

[7]   Compare AC ¶ 88 ("At all relevant times, Conradt knew or should have known that the Inside Information provided to him by Martin had been . . . transmitted . . . for Martin's personal benefit.") with Ex. 3, Conradt Tr. 222:2–228:16 (testifying that the SEC had spoken with Conradt in the weeks before filing the Amended Complaint, and that they never asked him any questions on the connection between the personal benefit and the allegations of personal favors) and Ex. 2, Martin Tr. 84:3–91:20 (testifying that Martin had never seen the Amended Complaint before, and that paragraph 88 was inconsistent with his recollection).

Discovery has revealed that all of the allegations in the amended complaint about personal benefits and knowledge thereof are unsupported by the SEC's cooperating witnesses. These fatal deficiencies in the SEC's case should have been known to the SEC before it amended its Complaint. To the extent the SEC was surprised by what has now been laid bare in discovery, it is only because the SEC chose to close its eyes and avoid asking obvious factual questions of its cooperating witnesses, presumably fearful that truthful answers could prove inconvenient to its theory of the case. See In re Millenial Media, Inc. Securities Litig., No. 14 Civ. 7923(PAE), 2015 WL 3443918, at *11 (S.D.N.Y. May 29, 2015) ("[I]t is reasonable to expect counsel, before filing the Complaint, to attempt to confirm with the witness statements that counsel proposes to attribute to him and to assure that the Complaint is presenting these statements in fair context.").

information to Durant, Conradt felt he had to tell Payton. Ex. 3, Conradt 147:21–148:10; 56.1 ¶ 44. Conradt would have preferred if Durant and Payton had not known the SPSS information in the first place because he did not know Durant and Payton as well as he knew Weishaus and Lehrer, and he was not confident that they would keep the information to themselves. Ex. 3, Conradt Tr. 174:1–14; 56.1 ¶ 45.

Conradt and Lehrer told Payton that they (Conradt and Lehrer) had heard a rumor or tip about a buyout involving SPSS. Ex. 4, Payton Tr. 153:13–154:8; Ex. 3, Conradt Tr. 149:2–149:14; 56.1 ¶ 46. Payton recalled knowing that an acquaintance of Conradt's named "Trent" had told Conradt about a buyout. Ex. 4, Payton Tr. 174:7–174:24; 197:19–198:21; 56.1 ¶ 48. Durant learned from Conradt that a "friend" of Conradt's liked the stock and that IBM was "kicking the tires," and Durant received some information from Lehrer about SPSS's business. Ex. 5, Durant Tr. 183:18–187:14, 200:23–202:4; 56.1 ¶ 49. Payton and Durant ultimately bought options tied to SPSS stock performance in July 2009; 56.1 ¶ 50. Neither Payton nor Durant recall knowing anything about whether Conradt lived with Martin (let alone the circumstances of their living arrangements), Conradt's assistance to Martin in connection with his arrest, or any details relating to Conradt's and Martin's relationship. Ex. 4, Payton 131:2–8; 152:13–18; 198:11–21; 141:14–142:4; Ex. 5, Durant Tr. 168:2–169:15; 56.1 ¶ 51.[8]

F.   Martin Turns To Dallas For Advice.

In late July 2009, Martin became concerned that his purchases of SPSS options shortly before he believed the acquisition was to be announced would arouse the suspicion of regulators.

---

[8]   Contrary to Payton's and Durant's testimony, Conradt thought that he had mentioned to Payton and Durant that the SPSS information had come from his roommate, though he did not recall telling them Martin's full name or where Martin worked.  Ex. 3, Conradt Tr. 150:20–151:11; 56.1 ¶ 47.

Ex. 2, Martin Tr. 59:24–61:5; Ex. 4, Dallas Tr. 89:5–90:10; 56.1 ¶ 52. Martin turned to Dallas to discuss the trades and how and whether he should unwind them. Ex. 2, Martin Tr. 61:6–62:9; Ex.1, Dallas Tr. 92:11–92:20; 56.1 ¶ 53. Dallas believed that Martin had "betray[ed]" him, "putting himself and me in jeopardy." Ex. 1, Dallas Tr. 90:24–91:15; 142:1–13; 56.1 ¶ 54. Dallas feared that "the information could be only traced to me" and that he could "lose his job, status, ability to remain in the United States." Ex. 1, Dallas Tr. 91:16–92:10; 56.1 ¶ 55. Ultimately, Martin sold all of his SPSS options and some, but not all, of his SPSS common stock before the acquisition's announcement. Later, Martin told Dallas that he did not unwind his purchase of SPSS common stock. Ex. 1, Dallas Tr. 93:23–94:7; 56.1 ¶ 56. Remarkably, Dallas testified that, after the SPSS acquisition, he and Martin grew even closer. Ex. 1, Dallas Tr. 144:10–23.

G.    The SPSS Acquisition Is Announced.

The SPSS acquisition was announced on Tuesday, July 28, 2009. Ex. 3, Conradt Tr. 174:15–174:18; 56.1 ¶ 57. That evening, Payton, Durant, Conradt, Weishaus, Lehrer and another acquaintance of Conradt's met at the Morgan Hotel to discuss the transaction. Payton recalls asking Conradt directly about the source of the SPSS information. Conradt, who did not know that Dallas was the source, replied that the SPSS information was just being "passed around the locker room." Ex. 4, Payton Tr. 242:2–244:4; 56.1 ¶ 58. For his part, Durant told the rest of the room that he was not worried because they had done nothing wrong. Ex. 5, Durant Tr. 276:22–277:7; 56.1 ¶ 59.

Conradt testified that after the Morgan Hotel meeting, Martin asked Conradt whether he had purchased any SPSS options. Ex. 3, Conradt Tr. 24:1–25:17; 214:8–15. When Conradt said he only bought shares of the stock, and not options, and that he made approximately $2,000, Martin was "kind of apologetic, kind of like for coming on strong about the questions about the

options and shares" and thanked Conradt for his assistance in connection with Martin's arrest. Id. Martin has testified that he does not recall ever making this comment or having this conversation with Conradt. Ex. 2, Martin Tr. 88:14–89:9.

On July 29, 2009, Payton transferred his SPSS proceeds from his account at EuroPacific, which was visible to all EuroPacific employees, to an Interactive Brokers ("IB") account, stating, falsely, to the IB customer service representative that he was employed as a real estate consultant. He did so to avoid having his EuroPacific colleagues see how much money was in his firm brokerage account. Ex. 4, Payton Tr. 273:17–275:17; 56.1 ¶¶ 60–61.

In November 2009, in response to a EuroPacific written questionnaire about his SPSS trades, Payton stated that he had learned of SPSS from Durant. Ex. 4, Payton Tr. 283:11–284:24; 56.1 ¶ 62. In response to that same questionnaire, Durant stated that he learned about SPSS through research on Fidelity.com. Ex. 5, Durant Tr. 285:18–286:11; 56.1 ¶ 63. Neither told the truth that they learned the SPSS information from Conradt.

Payton and Durant were both fired from EuroPacific in November 2009. Durant is currently unemployed. Payton works, periodically, as a late-night security guard.

H.  Dallas Lies To His Employer And Encourages Martin To Leave The United States.

Despite knowing that Martin had traded in SPSS stock, Dallas again disclosed information about a Cravath deal to Martin, shortly after the SPSS announcement. This time the information concerned a potential acquisition involving United Airlines. Ex. 2, Martin Tr. 70:2–71:10; 56.1 ¶ 64.

In or around November 2010, Cravath representatives approached Dallas concerning SPSS trades. Dallas lied to his colleagues and claimed that Martin had stolen confidential SPSS documents from Dallas's apartment. Ex. 1, Dallas Tr. 106:4 –106:25; 56.1 ¶ 65. Dallas also told

Martin that he might be under scrutiny. Martin thought it would be best if he left the United

States, and Dallas, the lawyer, said that would be the "simplest" solution. Ex. 1, Dallas Tr.

178:23–179:17; 56.1 ¶ 66.

      To this day, the SEC has not charged Dallas with any wrongdoing.

## ARGUMENT

## I.    STANDARD OF REVIEW

      A court may grant summary judgment when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

While the court must "'resolve all ambiguities and draw all factual inferences in favor of the

nonmovant,'" Gordon v. Sonar Capital Mgmt LLC, et al., No. 11 Civ. 9665 (JSR), 2015 WL

4554194, at *1 (S.D.N.Y. July 30, 2015) (quoting Robinson v. Concentra Health Servs. Inc., 781

F.3d 42, 44 (2d Cir. 2015)), there must be a "genuine dispute" about facts for summary judgment

to be inappropriate. Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769 (2007) (internal quotation

marks omitted).

## II.    PAYTON AND DURANT DID NOT COMMIT INSIDER TRADING

      As this Court previously held, Newman governs the elements of insider trading liability

for tippees in misappropriation cases. See SEC v. Payton, No. 14 Civ. 4644 (JSR), 2015 WL

1438454 (S.D.N.Y. April 6, 2015). Newman established that:

> [T]o sustain an insider trading conviction against a tippee, the
> Government must prove each of the following elements . . . that (1)
> the corporate insider was entrusted with a fiduciary duty; (2) the
> corporate insider breached his fiduciary duty by (a) disclosing
> confidential information to a tippee (b) in exchange for a personal
> benefit; (3) the tippee knew of the tipper's breach, that is, he knew
> the information was confidential and divulged for personal benefit;

and (4) the tippee still used that information to trade in a security
or tip another individual for personal benefit. 773 F.3d at 450.[9]

As Dirks and its progeny emphasize, the concept of an exchange is central to a finding of

personal benefit. See Dirks, 463 U.S. at 662 ("The test is whether the insider personally will

benefit, directly or indirectly, from his disclosure."); Newman, 773 F.3d at 447 ("Dirks counsels

us that the exchange of confidential information for personal benefit is not separate from an

insider's fiduciary breach; it is the fiduciary breach that triggers liability for securities fraud

under Rule 10b-5."). With respect to the sufficiency of evidence to support a finding of personal

benefit, Newman explained that "the personal benefit received in exchange for confidential

information must be of some consequence." 773 F.3d at 452. A personal benefit includes "'not

only pecuniary gain, but also, *inter alia*, any reputational benefit that will translate into future

earnings and the benefit one would obtain from simply making a gift of confidential information

to a trading relative or a friend.'" Id. at 452 (citing United States v. Jiau, 734 F.3d 147 at 153);

Dirks, 463 U.S. 646 at 663. This standard can be satisfied where there is "a meaningfully close

relationship" or "a relationship between the insider and the recipient that suggests a *quid pro quo*

from the latter, or an intention to benefit the [latter]." Newman, 773 F.3d at 452 (citing Jiau, 734

F.3d at 153). The holding in Newman requiring proof of a *quid pro quo* or an intention to benefit

the tippee applies to casual or business relationships that some might call friendships but do not

qualify as obviously close friendships per Dirks—in other words, when no close friendship or

---

[9]   In misappropriation cases, a duty of trust or confidence substitutes for the fiduciary duty
      described in Newman.  Such a duty can exist whenever "the person communicating the
      material nonpublic information and the person to whom it is communicated have a history,
      pattern, or practice of sharing confidences, such that the recipient of the information knows
      or reasonably should know that the person communicating the material nonpublic
      information expects that the recipient will maintain its confidentiality."  17 C.F.R.  §
      240.10b5-2(b).

family relationship exists. <u>Newman</u>, 773 F.3d at 452; <u>United States v. Gupta</u>, 11 Cr. 907 (JSR),

2015 WL 4036158, at *3 (S.D.N.Y. July 2, 2015); <u>Gordon</u>, 2015 WL 4554194, at *1; <u>United</u>

<u>States v. Salman</u>, No. 14-10204, 2015 WL 4068903, at *5–7 (9th Cir. 2015).

In addition to proof of a personal benefit to the tipper, the SEC must prove that the

downstream tippees "knew or had reason to know of that benefit." <u>SEC v. Obus</u>, 693 F.3d 276,

288 & n.2 (2d Cir. 2012); <u>cf</u>. <u>Newman</u>, 773 F.3d at 449. Inferring knowledge of a personal

benefit due to downstream tippees knowing "the mere fact of friendship" between the primary

tipper/tippee is impermissible "in the absence of proof of a meaningfully close personal

relationship that generates an exchange that is objective, consequential, and represents at least a

potential gain of a pecuniary or similarly valuable nature." <u>Newman</u>, 773 F.3d at 452; <u>Gupta</u>,

2015 WL 4036158, at *3.

The SEC's case is premised on a theory that (1) Martin violated a duty of trust and

confidence by trading on the tipped information because Dallas did not intend for Martin to

trade; (2) Martin received a personal benefit from Conradt in exchange for the SPSS information;

and (3) Defendants knew or had reason to know about that personal benefit to Martin. <u>See</u>

Amended Complaint, ¶¶ 87, 92. Defendants need only show that the undisputed evidence fails as

to any one of these prongs for the SEC's claim to fail. The evidence adduced in discovery, for

which there is no issue of material fact in genuine dispute, undermines all three.

A.   <u>Martin Did Not Disclose The Confidential SPSS information For A Personal</u>
     <u>Benefit</u>

   1.   *Martin And Conradt Were Not Close.*

This Court cannot credit the SEC's unsupported theory that a personal benefit can be

inferred based on the closeness of Martin's and Conradt's roommate relationship. Both Martin

and Conradt stated that they were *not* close friends. Both testified that any "friendship" was a

function of the fact that they were cordial roommates. At the time of the tips, Conradt and Martin

had known each other for nine months, and for the majority of that time, Conradt was secretly

taking advantage of Martin to subsidize his rent, a fact which angered Martin when he

discovered it in June 2009. See Ex. 3, Conradt Tr. 93:22–94:24, 108:16–109:14, 208:10–208:17;

Ex. 2, Martin Tr. 25:23–26:7; 56.1 ¶ 23. The SEC has adduced no evidence demonstrating they

were close friends because they were not, and there is simply no issue of material fact in genuine

dispute on this issue.[10]

### 2.   *There Is No* Quid Pro Quo.

There is no evidence of a *quid pro quo* relationship. Conradt's uncontroverted testimony

is that the "mundane minutia of the day-to-day-life of being a roommate" bore "[a]bsolutely

no[]" connection to the information Martin provided to Conradt about SPSS. Ex. 3, Conradt Tr.

228:4–10. He performed these chores to benefit himself, and he would have done so even had he

lived alone. Ex. 3, Conradt Tr. 206:21–207:23; 56.1 ¶ 28.[11] The fact that Martin may also have

enjoyed the results of Conradt's efforts as well is of no moment because both Conradt and

Martin have repeatedly disavowed any connection between the household chores and the tip. In

---

[10]   For examples where courts have found close friendships and personal benefits, see, e.g., SEC v. Warde, 151 F.3d 42, 48–49 (2d Cir. 1998) (tipper and tippee were good friends who often discussed their business and investing interests); SEC v. Downe, 969 F. Supp. 149, 152 (S.D.N.Y. 1997) (tipper and tippee socialized several times a year, played cards together, often discussed subjects ranging from art to the stock market, and tipper testified that they became good friends); United States v. Evans, 486 F.3d 315, 319 (7th Cir. 2007) (tipper and tippee became friends in college where they met as freshmen, talked daily via email or phone, and saw each other frequently); SEC v. Maio, 51 F.3d 623, 632 (7th Cir. 1995) (tipper's tip "was just one of many favors that he [had] done for [tippee] through the years by reason of their friendship.").

[11]   Indeed, Conradt's completion of a variety of household chores was done well before he received any information about SPSS.  See Newman, 773 F.3d at 453 (fact that tippee provided purported benefits prior to trade factored in finding no *quid pro quo*).

addition, Martin stated he did not provide Conradt with the SPSS information in exchange for any "favors." Ex. 2, Martin Tr. 89:10–90:8. In fact, Martin did not consider Conradt's actions to be favors at all. After discovery, the SEC can proffer no facts that the household chores or rent reduction had *any* connection whatsoever to Martin's tip.

No genuine dispute as to any material fact on this issue exists, and as a matter of law, there is therefore no basis for finding a *quid pro quo* relationship. The evidence only shows there was an action taken by Conradt and a tip by Martin. But absent any exchange connecting the two, there is no breach and no liability on the basis of a *quid pro quo*. Thus, even if this Court is persuaded that the woefully inadequate personal benefit alleged here meets the threshold under Dirks and Newman, without evidence that it was "exchanged for" the SPSS information, this evidence remains insufficient as a matter of law. See Newman, 773 F.3d at 453 (no *quid pro quo* because tipper "disavowed that any such *quid pro quo* existed" and tippee gave tipper "career advice" before tipper provided inside information and thus there was no exchange).[12]

3.  *Martin Did Not Intend To Benefit Conradt With A Gift Of Confidential Information.*

There is also no evidence that Martin intended to benefit Conradt. After Martin learned about the SPSS acquisition from Dallas in early June, Martin disclosed the SPSS information to Conradt. Martin testified that he did so because Conradt happened to be around at the time and

---

[12]  The facts here pale in comparison to cases where courts have found such a *quid pro quo* relationship to exist.  See, e.g., Jiau, 734 F.3d 147, 153 (2d Cir. 2013) (in joining investment club, tipper "entered into a *quid quo pro* [*sic*] relationship with [the tippee], and thus had the opportunity to access information that could yield future pecuniary gain."); United States v. Riley, 13 Cr.339 (VEC), 2015 WL 891675, at *8 (S.D.N.Y. March 3, 2015) (tipper provided confidential information in exchange for access to tippee's contacts and investment advice); SEC v. Sargent, 229 F.3d 68, 77 (1st Cir. 2000) (evidence of personal benefit where tipper passed information to a friend who referred others to the tipper for dental work).

Martin wanted Conradt's views regarding the propriety of his SPSS trades. Ex. 2, Martin Tr. 17:15–20:5. In other words, Martin was simply looking after his own interests, not Conradt's. He had no intention of benefitting Conradt with the SPSS information. There is no contradictory evidence in the record.

Martin's testimony is consistent with that of Conradt. After the SPSS announcement, Conradt recalled that Martin, upon learning that Conradt had not traded options, expressed relief, thanked Conradt for his effort to help with his arrest, and made an off-hand remark that he was glad that Conradt made some money. Ex. 3, Conradt Tr. 24:1–25:17; 214:8–15. Martin does not recall this conversation. Ex. 2, Martin Tr. 88:14–89:9. But even if this conversation occurred, both Conradt and Martin explicitly reject any connection between the tip and the post-arrest assistance. Moreover, Conradt received the SPSS information *before* he was arrested. This well after-the-fact conversation simply cannot change the fact of Martin's uncontroverted testimony that he did not tip Conradt in exchange for any personal benefit. Thus, Conradt's actions had no temporal or other connection to any tips, and it therefore could not and did not motivate Martin to disclose the SPSS information.

B.    Payton And Durant Did Not Know, And Had No Reason To Know, About Any Personal Benefit To Martin.

The uncontroverted evidence shows that Payton and Durant "knew next to nothing about the insiders and nothing about what, if any, personal benefit had been provided to [the tipper]." Newman, 773 F.3d at 453. Payton knew only that the SPSS information came from a person named "Trent," whom Payton recalled being an "acquaintance" of Conradt's and whom Payton may have met once in passing. Ex. 4, Payton Tr. 141:9–142:4; 198:2–6; 56.1 ¶ 48; see also Ex. 3, Conradt Dept., Tr. 59:21–22 (testifying that Conradt did not know whether Martin and Payton had ever met). After the trade, Conradt told Payton that the SPSS information had been passed

around a locker room. There is equally no evidence of Durant's knowledge of personal benefit: Durant only knew that Conradt's source was a "friend." Ex. 5, Durant Tr. 168:2–169:15; 56.1 ¶ 49. This is the extent of Defendants' knowledge of Martin: they did not know where "Trent" or the "friend" worked, whether Conradt and "Trent" or the "friend" were roommates, any details about their living situation or their relationship. Martin testified that he did not remember ever meeting or hearing of Payton or Durant. Ex. 2, Martin Tr. 75:4–75:16.

On this record, there is no issue of material fact in genuine dispute. Payton and Durant did not know, and had no reason to know, that there was a *quid pro quo* relationship between Martin and Conradt or that Martin intended to benefit Conradt with a gift of confidential information. A jury would have no factual basis upon which to infer that Payton or Durant knew or should have known Conradt and Martin had "a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." Gupta, 2015 WL 4036158, at *3 (internal quotation marks omitted). The SEC has adduced no evidence demonstrating any knowledge of personal benefit.[13]

The SEC may argue that the specificity of the SPSS information, coupled with Defendants' post-trade conduct, raises sufficient questions of fact that the Defendants had reason to know that there was a personal benefit. But even if a fact-finder were to conclude that the SPSS information was sufficiently specific to support an inference that Defendants knew that the SPSS information came from an inside source, that "cannot, without more, permit an inference

---

[13]   Although the U.S. Government has sought certiorari on Newman's holding with regard to proof of personal benefit, the Government has not challenged Newman's holding requiring proof of the defendant's knowledge of that benefit.  The requirement that the remote tippee have knowledge of any personal benefit is settled law.

as to that source's improper *motive* for the disclosure." <u>Gordon</u>, 2015 WL 4554194, at *5 (quoting <u>Newman</u>, 773 F.3d at 455). In <u>Gordon</u>, for example, the plaintiffs argued that an inference of Defendant's knowledge of a personal benefit could be drawn because the tippee was aware that the information likely originated from an inside source, based on the fact that the source had consistently provided the tipper with accurate information, of the type that companies generally keep confidential. The defendant even testified that he had "guessed" that the source might be a relative of the immediate tipper. <u>Gordon</u>, 2015 WL 4554194, at *5–6. This Court rejected the plaintiffs' argument, reasoning that, even if there were evidence that the information came from the inside, that evidence "is not a sufficient basis for a jury to conclude that [the tippee] knew it was disclosed in a breach of a fiduciary duty." <u>Id</u>. at *5; <u>cf</u>. <u>Chiarella v. United States</u>, 445 U.S. 222, 233, 100 S Ct. 1108 (1980) (there is no "general duty between all participants in market transactions to forgo actions based on material, nonpublic information").

Here, there is similarly nothing about the SPSS information itself, or the Defendants' conduct after the acquisition was announced, that could reasonably lead to an inference that the Defendants knew or had reason to know about a personal benefit. No such inference could be made even if Defendants could have guessed that "Trent" or Conradt's "friend" had access to an inside source based on the type of information that he provided, and even if Defendants speculated that "Trent" and Conradt were close friends (which neither Defendants testified to doing). Such a "building of inference upon inference, none of them more than speculative, cannot meet plaintiff's burden." <u>Gordon</u>, 2015 WL 4554194, at *5. For that reason alone, the Amended Complaint must be dismissed with prejudice.

C.      Martin Did Not Breach Any Duty Of Trust Or Confidence Between Him And Dallas.

The entire foundation of the SEC's theory of this case—that Dallas was victimized by the deceit of Martin—is completely spurious and based on Dallas's self-serving and unbelievable testimony. Dallas's testimony that he believed Martin would keep the SPSS information confidential is contradicted not only by Martin's testimony, but also Martin's text message to Dallas stating, "I am going to hit the stock I reckon," just two days after Dallas disclosed the SPSS information to him. While credibility determinations are ordinarily the province of the jury and not for the court to decide on summary judgment, courts have not hesitated to grant summary judgment where, as here, no rational trier of fact could credit the testimony. See, e.g., Jeffreys v. City of New York, 426 F.3d 549, 555 (2d Cir. 2005) (affirming grant of summary judgment because "'[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made'" by plaintiff) (quoting Schmidt v. Tremmel, No. 93 Civ. 8588 (JSM), 1995 WL 6250, at *3 (S.D.N.Y. Jan. 6, 1995) ("[I]ssues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds.").

For example, in Quick v. Quinn, No. 12 Civ. 1529 (DNH) (DEP), No. 2014 WL 4627106, at *5 (N.D.N.Y. Sept. 11, 2014), plaintiff, a prisoner, claimed that he was assaulted by, among others, Defendant Reilly, a corrections officer. Reilly disputed this account and said that he was not working at the prison on the day in question, a fact which was corroborated by his timecard. The Court stated that "the only record evidence that exists to support the allegation that Reilly participated in the assault . . . is plaintiff's self-serving and unsupported statement contained in his complaint." Id. The Court held that on the basis of this record "no reasonable factfinder could conclude that Reilly participated" and granted him summary judgment. Id.

As in <u>Quick</u>, Dallas's testimony that he disclosed the SPSS information in all its detail to Martin for the purpose of getting Martin's moral support should be viewed with great skepticism. Even more than a plaintiff in a civil action, Dallas had every incentive to skew the facts so as to avoid criminal prosecution and an SEC enforcement action. And, indeed, his testimony is unbelievable on its face. Dallas testified that he had to tell Martin the parties to the transaction and the price per share that IBM was offering (and according to Martin, the timing of the deal)— perhaps the most confidential pieces of information from the assignment—in order to explain to Martin why he was anxious. Dallas also said he needed to tell Martin the price per share in order for Martin to appreciate the "significance" of the deal and therefore his anxiety about it. Ex. 1, Dallas Tr. 134:9–135:2. Yet somehow, even though the premium was crucial to getting Martin to understand, Dallas did not know whether he would have been less stressed if the premium had been smaller. Ex. 1, Dallas Tr. 135:3–7. When asked why it was important that Martin know that SPSS was the target, Dallas had nothing to say.[14]

Not only is Dallas's testimony facially incredible, but it is contradicted by the SEC's own cooperator, Martin, as well as the June 1 text, the only contemporaneous document directly referencing the disclosure of the information about "that stock." Martin testified that he left the May lunch with Dallas under the impression that Dallas expected him to trade. Ex. 2, Martin Tr. 56:22–57:5. Martin further testified that when he discussed his trading in SPSS stock and options with Dallas in late July, Dallas was upset only because Martin's reckless trading in options might

---

[14]    Dallas's explanation for disclosing to Martin client information relating to the Genentech and Pepsi deals—namely, that he needed to explain why he had to change social plans—is similarly outlandish.  Ex. 1, Dallas Tr. 50:11–51:25 (informing Martin on March 6, 2009 that he would be late because Roche "upped the genentech bid."); Ex. 1, Dallas Tr. 57:11–60:1 (asking Martin to host one of Dallas's friends on May 14, 2009 because "Pepsi is probably going to go hostile to buy two bottling subs it already has a stake in"); 56.1 ¶ 7.

lead to detection of his own role in disclosing the SPSS information. Ex. 2, Martin Tr. 62:10–64: 12; Dallas Tr. 90:24–92:8; 56.1 ¶¶ 54–55. Indeed, Dallas's story that Martin's trading breached his duty of trust and confidence is completely undermined by the fact that within weeks of learning of Martin's SPSS trades, Dallas leaked confidential, non-public information to Martin about yet another deal he was working on, United's attempted takeover of US Air, including the names of the parties, the expected price, and estimated timeline. Ex. 2, Martin Tr. 71:21–73:14; Ex. 1, Dallas Tr. 158:20–162:25; see also 56.1 ¶ 64.

Martin's testimony is corroborated by the critical text message. On June 1—only a day or two after Dallas disclosed the SPSS information—Martin told Dallas that he would "hit that stock," a reference Martin has stated could only be referring to SPSS given the timing of the text. Fishbein Decl., Ex. A; 56.1 ¶ 11. There is no doubt that Dallas received the text since he responded 15 minutes later with a message about weekend plans; significantly, Dallas expressed no surprise or concern about Martin's intention to "hit that stock." Id.; 56.1 ¶ 12. Just two days later, on June 3, 2009, Martin purchased SPSS. The text established that, in complete contradiction to Dallas's self-serving testimony, Martin told Dallas that he would trade, and Dallas made no effort to stop him.

No rational juror could credit Dallas's self-serving story. Not only has he had every motive to lie in order to avoid prosecution and an SEC enforcement action (which he has so far succeeded in avoiding) but there is no other evidence in the record that supports his ludicrous explanation that he shared intimate details of non-public transactions because he was "anxious" or needed to explain his inability to keep social engagements. To the contrary, the other evidence—most notably Martin's testimony that he believed Dallas expected him to trade and the contemporaneous text message expressing Martin's intention to do so—directly contradict

Dallas's story. In such circumstances, this Court should not hesitate to reject Dallas's testimony and because there are no facts otherwise supporting the SEC's underlying theory of its amended complaint, grant Defendants' motion for summary judgment. See Scott, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## III.    CONCLUSION

For the foregoing reasons, Defendants Payton and Durant respectfully request this Court to grant summary judgment in favor of Defendants.

Dated:          New York, New York
                August 14, 2015

/s/ Gregory Morvillo
Gregory Morvillo
E. Scott Morvillo
MORVILLO LLP
One World Financial Center
27th Floor
New York, New York 10281
Tel.:  (212) 796-6330
Email:  gmorvillo@morvillolaw.com


*Counsel for Benjamin Durant III*

/s/ Matthew E. Fishbein

Matthew E. Fishbein
Sean Hecker
Rushmi Bhaskaran
Noam Greenspan
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel.:  (212) 909-6000
Email:  mefishbe@debevoise.com

Jonathan R. Tuttle
Ada Fernandez Johnson
DEBEVOISE & PLIMPTON LLP
555 13th Street, N.W.
Washington, D.C. 20004
Tel.:  (202) 383-8000
*Counsel for Daryl M. Payton*

25