```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,      :
                                         :     14 Civ. 4644
         Plaintiff,                      :
                                         :        OPINION
         -v-                             :
                                         :
DARYL M. PAYTON, and                     :
BENJAMIN DURANT, III,                    :
                                         :
         Defendants.                     :
-----------------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12-28-15

JED S. RAKOFF, U.S.D.J.

On September 10, 2015, this Court denied the motion for summary judgment filed by defendants Daryl M. Payton and Benjamin Durant, III in the insider trading lawsuit that plaintiff Securities and Exchange Commission (SEC) has brought against them. See Order dated Sept. 10, 2015, Dkt. 71. This Opinion sets out the reasons for the Court's denial of summary judgment.

By way of background, it is undisputed that the ultimate source of the inside information here pertinent was Michael Dallas, an attorney at Cravath, Swaine & Moore LLP in New York, who by virtue of his job gained access to material nonpublic information concerning several pending corporate transactions. See Defendants Daryl M. Payton's and Benjamin Durant, III's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Defs. 56.1"), Dkt. 56, ¶ 1-2; Plaintiff Securities and

1

Exchange Commission's Response to Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Pl. Opp. 56.1"), Dkt. 61, ¶ 1-2. Dallas held a close friendship with Trent Martin, an equities salesman at The Royal Bank of Scotland. See Defs. 56.1 ¶ 5; Pl. Opp. 56.1 ¶ 5. As part of this friendship, Martin and Dallas had a history of sharing confidential information, and each expected the other to maintain confidentiality. See, e.g., Greenspan Declaration, Dkt. 69, Exhibit C (Martin Deposition) 45:24-47:8; Littman Declaration, Dkt. 62, Exhibit 1 (Martin Deposition) 97:18-100:24, 106:3-11.

On May 29 or 30, 2009, Dallas told Martin over lunch that Dallas had been assigned to work on IBM's acquisition of SPSS, a deal that had not yet been announced to the public. See Defs. 56.1 ¶ 8, 57; Pl. Opp. 56.1 ¶ 8, 57. In what the SEC alleges was a breach of their relationship of trust and confidence, Martin, based on the information, not only bought SPSS stock for himself, see Defs. 56.1 ¶ 13; Pl. Opp. 56.1 ¶ 13, but also conveyed the information to Martin's roommate, Thomas Conradt, a broker at EuroPacific Capital and recent law school graduate. See Defs. 56.1 ¶ 14, 29; Pl. Opp. 56.1 ¶ 14, 29. The confidential information included both the price of the SPSS

acquisition and the approximate timing of its public announcement. Defs. 56.1 ¶ 42; Pl. Opp. 56.1 ¶ 42.

Conradt then provided the confidential information to his close friends David Weishaus and Matthew Lehrer, both of whom worked at EuroPacific. See Defs. 56.1 ¶ 43; Pl. Opp. 56.1 ¶ 43. When Conradt discovered that Lehrer had, in turn, disclosed the confidential SPSS information to their mutual colleague Benjamin Durant (one of the defendants here), Conradt felt obliged to share the information with another mutual colleague, Daryl Payton (the other defendant here). See Defs. 56.1 ¶ 44; Pl. Opp. 56.1 ¶ 44.

Based on this information, Payton and Durant purchased SPSS options, the value of which would increase if the SPSS stock price rose following public announcement of IBM's acquisition of SPSS. See Defs. 56.1 ¶ 50; Pl. Opp. 56.1 ¶ 50, 119-20; Defendants' Responses to Plaintiff's Additional Material Facts Pursuant to Local Civil Rule 56.1(b) ("Defs. Reply 56.1"), Dkt. 70, ¶ 119-20. The SPSS acquisition was announced on July 28, 2009, and, as expected, the price of the stock rose. See Defs. 56.1 ¶ 57; Pl. Opp. 56.1 ¶ 57. According to the SEC, Payton and Durant collectively made more than $290,000 as a result. Plaintiff Securities and Exchange Commission's Opposition to

3

Defendants' Motion for Summary Judgment ("Pl. Opp. Br."), Dkt. 60, at 1.

The SEC filed suit against defendants Payton and Durant on June 25, 2014, alleging that defendants had violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder. See Complaint, Dkt. 2, ¶¶ 87-91. On August 14, 2015, defendants moved for summary judgment. See Notice of Motion, Dkt. 53. Summary judgment in favor of defendants is warranted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court must "construe all the evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Amidon v. Student Ass'n of State Univ. of New York at Albany, 508 F.3d 94, 98 (2d Cir. 2007).

The instant case is being pursued under the "misappropriation" theory of insider trading liability, according to which "a person commits fraud 'in connection with' a securities transaction . . . when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." United States v. O'Hagan, 521 U.S. 642, 652 (1997). The duty so owed

4

may be a fiduciary duty or it may be a similar duty of trust and confidence. Id. Of particular relevance here, the SEC has, by promulgating Rule 10b5-2, codified and expanded the duty of trust and confidence applicable to misappropriation cases, so that it exists, inter alia, "[w]henever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality." 17 C.F.R. § 240.10b5-2.

Coupling this definition with the Second Circuit's requirements set forth in United States v. Newman, 773 F.3d 438 (2d Cir. 2014), cert. denied, 136 S. Ct. 242 (2015),[1] and applying the combination to the issues that both sides here agree are the focus of the instant case, the SEC, to prevail on its claims against Payton and Durant, must show by a preponderance of the evidence: (1) that Martin owed a duty of trust and confidence to the source of the material non-public information about the SPSS transaction, namely, Dallas; (2) that

---

[1] Although Newman was not a misappropriation case, its key holdings expressly apply to such cases, as well as to "classic" insider trading. See Newman, 773 F.3d at 450; SEC v. Payton and Durant, 97 F. Supp. 3d 558, 562 (S.D.N.Y. 2015).

Martin breached that duty by disclosing the confidential SPSS information to Conradt; (3) that Martin received a personal benefit from disclosing the information to Conradt; and (4) that Conradt's tippees, defendants Payton and Durant, understood both that the SPSS information was confidential and that Martin had disclosed this information to Conradt in exchange for a personal benefit.

As to the first and second elements, the Court finds that there are reasonable disputes of material fact with respect to whether Martin owed and breached a duty of trust and confidence to Dallas. It is undisputed, as noted above, that Martin and Dallas were close friends, see Defs. 56.1 ¶ 5; Pl. Opp. 56.1 ¶ 5. There is also ample evidence that the two men repeatedly shared confidential information with each other. See, e.g., Greenspan Declaration, Exhibit C, 45:24-47:8; Littman Declaration, Exhibit 1, 97:18-98:16. Further still, there is ample evidence that these exchanges were part of an arrangement of trust and confidence that met the requirements of Rule 10b5-2. For example, Martin testified that before the SPSS transaction, he did not reveal or trade on any confidential information provided by Dallas, see Littman Declaration, Exhibit 1, 99:6-100:24, and that when he supplied Conradt with the confidential information, he was violating his duty of trust and

6

confidence to Dallas, see Littman Declaration, Exhibit 1, 107:15-24. Similarly, Dallas testified that he expected Martin to keep the SPSS information to himself, see Littman Declaration, Exhibit 3 (Dallas Deposition), 81:5-16, and that when he found out that Martin had traded based on that information, he felt "angry because I thought it was a betrayal." See Bhaskaran Declaration, Dkt. 57, Exhibit 1 (Dallas Deposition), 142:1-13.

To be sure, there is competing evidence; but all this means is that the matter is genuinely disputed and must be resolved by a jury. For example, defendants place great weight on text messages sent between Dallas and Martin on June 1, 2009, a few days after Dallas disclosed the SPSS information to Martin and two days before Martin bought SPSS stock. See Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs. Br."), Dkt. 54, at 24; Fishbein Declaration, Dkt. 55, Exhibit A. Specifically, on the afternoon of June 1, 2009, Martin texted Dallas saying "I'm going to hit that stock I reckon." About fifteen minutes later, Dallas texted Martin saying "[w]ill call you tonight about the coming weekend, talk soon." See Fishbein Declaration, Exhibit A. According to defendants, these text messages undermine Dallas's "story that Martin's trading breached his duty of trust and confidence." Defs. Br. at 24.

7

However, Dallas testified that he does not remember receiving or reading the text message from Martin, and that the text message did not change his testimony that he did not expect Dallas to trade on the SPSS information, see Greenspan Declaration, Exhibit B (Dallas Deposition) 207:22-208:14, 210:3-19. Furthermore, the meaning and import of these text messages is subject to multiple reasonable interpretations, and their weight in relation to Dallas's testimony and Martin's and Dallas's previous sharing of confidences is a matter for the jury to decide. See Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).

As to the third element - that Martin received a personal benefit for disclosing the SPSS information to Conradt - summary judgment is similarly unwarranted. In Dirks v. SEC, 463 U.S. 646, 664 (1983), the Supreme Court defined a personal benefit as

> a pecuniary gain or a reputational benefit that will translate into future earnings. . . . There are objective facts and circumstances that often justify such an inference. For example, there may be a relationship between the insider and the recipient that suggests a quid pro quo from the latter, or an intention to benefit the particular recipient. The elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend.

Dirks, 463 U.S. at 664. Elaborating on this definition, the Second Circuit, in SEC v. Obus, 693 F.3d 276, 291 (2d Cir.

8

2012), stated that "the undisputed fact that [the tipper] and [the tippee] were friends from college is sufficient to send to the jury the question of whether [the tipper] received a benefit from tipping [the tippee]." Obus, 693 F.3d at 291.

Both Dirks and Obus were (like the instant case) civil SEC cases. But in Newman, a criminal case, the Second Circuit stated that "[t]o the extent Dirks suggests that a personal benefit may be inferred from a personal relationship between the tipper and tippee . . . we hold that such an inference is impermissible in the absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature. In other words . . . this requires evidence of 'a relationship between the insider and the recipient that suggests a quid pro quo from the latter, or an intention to benefit the [latter].'" Newman, 773 F.3d at 452, citing United States v. Jiau, 734 F.3d 147, 153 (2d Cir. 2013), cert. denied, 135 S. Ct. 311 (2014).

Newman did not purport to overrule Obus, and neither, obviously, could it overrule Dirks, so all three cases remain good law. Nevertheless, as this Court has previously noted, Payton, 97 F. Supp. 3d at 563, it is not so easy to reconcile the above quoted language from Dirks, Obus, and Newman. In the

9

instant case, the SEC, for example, contends that "[u]nder the binding precedent of Obus, undisputed evidence that the tipper and tippee were 'friends' is sufficient to overcome summary judgment," see Pl. Opp. Br. at 10, while defendants counter that the Obus case itself involved an "objectively close friendship" and is not at odds with Newman, see Defs. Br. at 6 & n.3. But regardless of the relationship among Dirks, Obus, and Newman, a reasonable jury could find that Martin tipped Conradt for a personal benefit under the standards enumerated in all of these cases, even Newman.

To begin with, the elaboration in Newman of "personal benefit" from the standpoint of a remote tippee is not directly applicable to the determination of the third element here – that Martin received a benefit from disclosing the information to Conradt – since, as this Court has previously held, "a tipper's intention to benefit the tippee is sufficient to satisfy the benefit requirement so far as the tipper is concerned, and no quid pro quo is required." United States v. Gupta, 11 Cr. 907, 2015 U.S. Dist. LEXIS 86635, at *5 (S.D.N.Y. July 2, 2015); see also Newman, 773 F.3d at 452; Jiau, 734 F.3d at 153.

This distinction aside, moreover, the admissible evidence proffered by the SEC satisfies even a quid pro quo requirement. This derives, in part, from the closeness of the relationship

10

between Martin and Conradt. They were more than mere roommates. Indeed, it is largely undisputed that they together ate dinner, drank beers, played video games, watched TV, used drugs, and discussed their respective days, current events, and personal details of their lives. See Pl. Opp. 56.1 ¶ 90; Defs. Reply 56.1 ¶ 90. Furthermore, as part of that relationship, Conradt frequently provided Martin with mutual benefits. Thus, Conradt took the lead in organizing and paying shared expenses, and resolving problems at the apartment. See Pl. Opp. 56.1 ¶ 96; Defs. Reply 56.1 ¶ 96. Conradt also handled several apartment-related repairs and negotiated with the landlord on rent. See Littman Declaration, Exhibit 4 (Conradt Deposition), 83:15-99:21.

As another example, around the same time as Martin was tipping Conradt, Conradt came to Martin's aid after Martin was arrested and charged with assault. See Pl. Opp. 56.1 ¶¶ 99-101; Defs. Opp. 56.1 ¶¶ 99-101. Although the parties dispute the precise nature of the roommates' interactions after this incident, both Martin and Conradt testified that, shortly following the event, Conradt arranged a conference call to discuss the incident with a law clerk friend of Conradt's. See Littman Declaration Exhibit 1, 37:3-13; Bhaskaran Declaration Exhibit 3 (Conradt Deposition), 104:3-106:13. Conradt testified

11

that the friend provided some thoughts about Martin's situation and that following this conversation, Conradt had subsequent conversations with Martin about possible strategies and sent Martin a couple of emails about the incident. See Bhaskaran Declaration Exhibit 3, 106:8-25.

Against this background of a close relationship and Conradt's doing favors for Martin, a reasonable juror could conclude not only that Martin intended to benefit Conradt by passing along the SPSS information, but also that it was in effect a quid pro quo for past and prospective services rendered by Conradt on behalf of Martin. In the words of Newman, they had "a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." Newman, 773 F.3d at 452.[2]

As to the fourth (i.e., final) element - that defendants Payton and Durant understood not only that the SPSS information was confidential but also that Martin had disclosed the information to Conradt in exchange for a personal benefit - it is not necessary for the SEC to prove that the remote tippees

---

[2] While Martin and Conradt subsequently denied that the SPSS information was, in their view, provided in exchange for a benefit, see, e.g., Greenspan Declaration, Exhibit C, 22:15-25; Greenspan Declaration, Exhibit D, 209:23-210:1, the credibility of these statements remains a matter for the jury to assess at trial.

had personal knowledge of the specific benefit conveyed. Rather, it is enough in a civil case like this one "that the defendant[s] 'knew or had reason to know' of the benefit to the tipper," in the general sense that they understood that a benefit was provided. Gordon v. Sonar Capital Mgmt. LLC, 11 Civ. 9665, 2015 WL 4554194 at * 1 (July 30, 2015), citing Obus, 693 F.3d at 288 & n.2; S.E.C. v. Jafar, No. 13 Civ. 4645, 2015 WL 3604228, at *4 & n.2 (S.D.N.Y. June 8, 2015). Indeed, even in the criminal context, as Newman itself indicates, such general knowledge may be sufficient, for defendants need not "know the details of the insider's disclosure of information" to be liable. Newman, 773 F.3d at 449 n.3.

In this respect, the record, viewed in the light most favorable to the SEC, includes the following relevant facts, among others. The defendants were sophisticated parties: they had been in the securities industry for several years as of June 2009, see Pl. Opp. 56.1 ¶ 110, Defs. Reply 56.1 ¶ 110, and were aware of the value of the SPSS information derived from its confidential nature, see, e.g., Littman Declaration Exhibit 23, 187:15-18. The defendants knew that Conradt's roommate Martin was the source of the SPSS information. See Littman Declaration, Exhibit 23 (Payton Deposition), 198:3-14; Littman Declaration, Exhibit 4 (Conradt Deposition), 149:3-14, 150:20-22, 172:20-

173:7. Defendants also knew Martin and Conradt were friends; see Greenspan Declaration, Exhibit E (Payton Deposition), at 130:18-132:25, 140:7-143:2; Littman Declaration, Exhibit 24 (Durant Deposition), at 184:6-14. In addition, Conradt testified that he told the defendants not to tell anyone about the SPSS information "[b]ecause I told them Trent [Martin] had mentioned not to say anything about it," Littman Declaration, Exhibit 4, at 173:1-7.

Despite all this, the defendants did not ask Conradt for more information about the source of the tip or its circumstances, see Littman Declaration, Exhibit 23, 184:17-23; Exhibit 24, 184:14-22. Their subsequent conduct reasonably suggests that this was because they understood, but chose to consciously disregard, the means by which the SPSS information was obtained. Specifically, after the SPSS deal was announced, the defendants participated in a meeting in a hotel in which various tippees discussed potential next steps and Durant suggested that if questioned about their SPSS transactions, everyone should say they "liked tech," see Littman Declaration, Exhibit 4, at 179:9-182:24, Littman Declaration, Exhibit 39, at 10. There is no evidence that Payton, who was present at that meeting, demurred. Moreover, in November 2009, in response to a EuroPacific written questionnaire about his SPSS trades, Payton

14

falsely stated that he had learned of SPSS from Durant. Defs. 56.1 ¶ 62; Pl. Opp. 56.1 ¶ 62. For his part, Durant, in response to the same questionnaire, falsely stated that he learned about SPSS through research on Fidelity.com. See Defs. 56.1 ¶ 63; Pl. Opp. 56.1 ¶ 63.

On these facts, a jury could reasonably find, at a minimum, that it was more likely than not that the defendants made deliberate choices not to inquire further into the circumstances under which Martin passed the SPSS information to Conradt, in order to remain technically ignorant of whether Conradt received a personal benefit, because they well understood that there was a high probability that just such a benefit had been provided. See Littman Declaration, Exhibit 23, 184:17-23; Exhibit 24, 184:14-22.

For all the foregoing reasons, the Court, by Order dated September 10, 2015, denied the defendants' summary judgment motion.

Dated:   New York, NY
         December 28, 2015

JED S. RAKOFF, U.S.D.J.

15