UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,   :

                                :       14 Civ. 4644

      Plaintiff,               :

                                :       OPINION AND ORDER

     -v-                      :

DARYL M. PAYTON, and
BENJAMIN DURANT, III,

      Defendants.
------------------------------------x

JED S. RAKOFF, U.S.D.J.

    In February 2016, Daryl M. Payton and Benjamin Durant, III
stood trial on insider trading charges brought by the Securities
and Exchange Commission ("SEC"). The SEC alleged that in 2009,
defendants Payton and Durant traded on material, non-public
information about IBM's pending acquisition of SPSS, Inc.
("SPSS"). See Amended Complaint, Dkt. 32, ¶ 1. On February 29,
2016, the jury held both defendants liable. See Verdict, Dkt.
136. During the trial, the issue arose of whether Mr. Payton
gave trial testimony that materially conflicted with the
allocution he provided while entering a guilty plea (now
vacated) in a parallel criminal case. Accordingly, the Court
conducted an inquiry into the matter (see infra) and invited
both defendant Payton and the SEC to submit letters after trial
on whether the Court should refer Mr. Payton to the U.S.
Attorney's Office for a possible perjury prosecution. See Letter

dated March 3, 2016 ("Payton Post-Trial Letter"); Letter dated
March 7, 2016 ("SEC Post-Trial Letter"). (These letters will be
docketed along with this Opinion.)

Having considered the parties' submissions, Mr. Payton's
testimony and demeanor at trial, and the prior history of the
case, the Court, while deeply troubled by the material
inconsistencies in Mr. Payton's statements given under oath,
hereby decides not to formally refer Mr. Payton to the U.S.
Attorney's Office for a possible perjury prosecution. This does
not negate the possibility, however, that the U.S. Attorney's
Office may on its own wish to investigate possible perjury by
Mr. Payton; and plaintiff SEC, like any party, is free to bring
this issue to the attention of the U.S. Attorney. However, a
court should hesitate before making such a formal referral,
given the weight that such a referral may have.

Nonetheless, in this case, the decision not to make a
referral was not easily reached, and the Court finds it
instructive to review the facts and principles that have
informed its decision. The federal perjury statute here
relevant, 18 U.S.C. § 1623, states that "[w]hoever under oath .
. . in any proceeding before or ancillary to any court or grand
jury of the United States knowingly makes any false material
declaration . . . shall be fined under this title or imprisoned

not more than five years, or both." 18 U.S.C. § 1623(a). This
statute, technically called the "False Declarations" statute,
was designed to supplement the earlier perjury statute, 18
U.S.C. § 1621, by eliminating some of the historic
hypertechnicalities with which the earlier statute was fettered.
In both cases, however, the federal perjury statutes aim to
"keep the course of justice free from the pollution of perjury,"
United States v. Williams, 341 U.S. 58, 68 (1951), since
"[p]erjury is an obstruction of justice; its perpetration well
may affect the dearest concerns of the parties before a
tribunal." United States v. Norris, 300 U.S. 564, 574 (1937). As
the Second Circuit has explained, "[n]o legal system can long
remain viable if lying under oath is treated as no more than a
social solecism. Swearing to tell the truth is a solemn oath,
the breach of which should have serious consequences." United
States v. Cornielle, 171 F.3d 748, 753 (2d Cir. 1999).

    Despite the seriousness of perjury, "it is undoubtedly the
case that a good many untruthful statements occur during the
course of a civil trial." Cornielle, 171 F.3d at 751.[1] Though

---

[1] In the 1970s, Judge Marvin E. Frankel of the Southern District of New York
estimated that "deliberately false testimony probably appears in important
aspects in as many as a quarter of all the cases we try." See Lying in the
Courtroom, Harper's Magazine, September 1973, at 10. Judge Frankel continued:
"I think perhaps the courts are too complacent about this and the crime of
perjury needs more vigorous prosecution." Id; see also Marvin E. Frankel, The
Search for Truth: An Umpireal View, 123 U. Pa. L. Rev. 1031, 1032 (1975)
("our adversary system rates truth too low among the values that institutions
of justice are meant to serve."). In 1995, an American Bar Association

criminal prosecutions have been brought for perjury in civil cases, see, e.g., United States v. Thompson, 29 F.3d 62 (2d Cir. 1994), United States v. Kross, 14 F.3d 751 (2d Cir. 1994), still, "the instances in which perjury in civil cases is prosecuted criminally are relatively rare." Miller v. Time-Warner Commc'ns, Inc., 97-cv-7286, 1999 WL 739528, at *3 (S.D.N.Y. Sept. 22, 1999). One explanation is that "many such falsehoods essentially are resolved by adverse jury verdicts, leaving for criminal prosecution those few instances where a witness' lie is so material to the truth-seeking function of a trial that the prosecutor (sometimes, upon the referral of the trial judge) elects to seek an indictment." Cornielle, 171 F.3d at 751. And yet the very fact that prosecution for perjury committed in a civil case is rare doubtless encourages civil litigants to believe they can lie with impunity. See Marvin E. Frankel, The Adversary Judge, 54 Tex. L. Rev. 465, 483 (1976).

Against this background, the Court turns to the factual and procedural history of the instant case. On June 25, 2014, the SEC filed suit against defendants Payton and Durant, contending that the defendants had violated the laws against insider

---

Journal article observed that "[m]ost of the more than 50 state and federal judges, as well as lawyers and academics, interviewed by the ABA Journal agree that perjury in some form permeates civil and criminal courts." The article quoted a statement from E. Michael McCann, a county prosecutor in Milwaukee who chaired the ABA Section of Criminal Justice: "If perjury were water, the people in civil court would be drowning." Mark Curriden, The Lies Have It, 81 ABA Journal 68, 69, 70 (1995).

trading by trading in SPSS securities ahead of IBM's acquisition
of SPSS. See Complaint, Dkt. 2, ¶ 1. On October 29, 2014,
Messrs. Payton and Durant were indicted in a parallel criminal
case in front of Judge Andrew Carter on one count of conspiracy
to commit securities fraud and multiple substantive counts of
securities fraud (three in Mr. Payton's case, and two in Mr.
Durant's case). See United States v. Conradt et al., 12-cr-887
(ALC), Dkt. 95[2] (Superseding Indictment). On November 6, 2014,
Mr. Payton pled guilty in front of Judge Carter to conspiracy to
commit securities fraud. See Transcript of Proceedings dated
Nov. 6, 2014, 12-cr-887, Dkt. 105 ("Payton Plea Tr."). After
being placed under oath, see Payton Plea Tr. 12:20-22, Mr.
Payton allocated as follows:

> In July of 2009 I was working as a stockbroker for a
> brokerage firm in Manhattan. One of the brokers at the
> brokerage firm told me his roommate told him that IBM
> would soon be acquiring a software company called SPSS
> at a specific price per share and that we should
> invest in this stock. I understood that once this
> acquisition was announced, the price of SPSS shares
> would rise dramatically. I purchased, from Manhattan,
> on a national securities exchange, options of SPSS
> based on this information. After the deal was
> announced I sold my options for a profit.
>
> Given the specificity of the information, it was
> apparent that this information was obtained in breach
> of fiduciary duty. In other words, I understood that
> this was inside information that was supposed to be

---

[2] This docket number refers to the 12-cr-887 docket, as do all other docket
numbers following a reference to the parallel criminal case's docket.

kept confidential and that it was illegal for me to trade on.

I apologize and I am very sorry for my actions.

THE COURT: And this activity, was this done pursuant it [sic] an agreement that you had with some other people?

(Defendant and counsel conferring)

THE DEFENDANT: An understanding? Yes. Yes, your Honor.

Payton Plea Tr. 28:13-29:8.

After further discussion with counsel, the Court asked Mr.

Payton some follow-up questions:

THE COURT: . . . You indicated that you felt the information had been provided in breach of a fiduciary duty because of the specificity of the information; is that correct?

THE DEFENDANT: Yes, your Honor.

THE COURT: Tell me a little bit more about that.

THE DEFENDANT: Just that he specified that the company, IBM, would be the likely acquirer of SPSS – sorry, that he spoke to IBM about specifically purchasing SPSS at a particular share price.

THE COURT: When you say "he," who[m] are you talking about?

THE DEFENDANT: Tom Conradt.

Payton Plea Tr. 35:16-36:3.

After receiving subsequent letters from the parties on the sufficiency of Mr. Payton's guilty plea, Judge Carter accepted his plea at a conference held on November 18, 2014. See

6

Transcript of Proceedings dated Nov. 18, 2014, 12-cr-887, Dkt. 146, 5:6-9. However, on December 10, 2014, the Second Circuit issued its decision in United States v. Newman, 773 F.3d 438 (2d Cir. 2014), raising issues about personal benefit to the tipper and about the tippee's knowledge of such benefit that were not part of Mr. Payton's allocution. At a status conference on December 18, 2014, Judge Carter stated that in light of Newman, he was inclined to vacate Mr. Payton's plea on the ground that there was an insufficient factual basis for the plea. See Transcript of Proceedings dated Dec. 18, 2014, 12-cr-887, Dkt. 143, 49:16-20. Judge Carter had the same view of the guilty pleas of Mr. Payton's co-defendants Trent Martin, Thomas Conradt, and David Weishaus. See id. at 24:22-25:1; 29:15-17: 41:24-42:3. Mr. Durant, however, had pled not guilty, so he was not implicated by Judge Carter's remarks.

On January 12, 2015, the Government submitted a brief to Judge Carter arguing that the defendants' guilty pleas were sufficient. See The Government's Memorandum of Law in Support of the Sufficiency of the Defendants' Guilty Pleas, 12-cr-887, Dkt. 153. On January 16, 2015, Mr. Payton moved to vacate his guilty plea, arguing that he had never admitted that he knew that the tipper had received a personal benefit, as Newman required. See Memorandum in Support of Daryl Payton's Motion to Vacate His

7

Guilty Plea, 12-cr-887, Dkt. 154, at 2-3. On January 22, 2015, Judge Carter vacated Mr. Payton's guilty plea (as well as the pleas of Messrs. Conradt, Martin, and Weishaus). See Order dated Jan. 22, 2015, 12-cr-887, Dkt. 166. Soon after, on January 30, 2015, the Government filed a nolle prosequi with respect to Messrs. Payton, Durant, Conradt, Martin, and Weishaus. See Nolle Prosequi, 12-cr-887, Dkt. 170.

Meanwhile, however, the parallel civil case in this Court continued forward, with the SEC arguing it could meet the Newman requirements. After this Court denied defendants' motion to dismiss and motion for summary judgment, see Opinion and Order dated Apr. 6, 2015, Dkt. 42; Order dated Sept. 11, 2015, Dkt. 71, the case proceeded to trial beginning on February 16, 2016. While on the witness stand on February 24, 2016, Mr. Payton made statements that seemingly were materially inconsistent with the statements he had made under oath at his plea allocution in the parallel criminal case (see infra). The Court, aware of Mr. Payton's prior statements before Judge Carter, felt particularly obligated to inquire further (outside the presence of the jury), for the following reasons:

Before trial, the SEC had moved in limine (1) to admit statements that defendant Payton made in his guilty plea allocution ("plea allocution statements") and to question him on

8

these statements; (2) in the alternative, to use these statements for the purposes of impeachment; and (3) to estop Mr. Payton from offering testimony or argument that contradicted his plea allocution statements. See Securities and Exchange Commission's Memorandum of Law in Support of Its Motion In Limine to Question Defendant Payton Regarding Statements in His Guilty Plea Colloquy and to Estop Payton From Offering Contradictory Testimony or Argument ("SEC Mot. in Limine Br."), Dkt. 100, at 1. The Court had denied the SEC's motion and, in particular, rejected the SEC's effort to use Mr. Payton's plea allocution statements for impeachment purposes. See Order dated Feb. 4, 2016, Dkt. 118; Transcript dated Feb. 29, 2016 ("Feb. 29 Tr."), 9:7-13.[3] In support of this ruling, the Court cited Rule 410 of the Federal Rules of Evidence. See Order dated Feb. 4, 2016; Feb. 29 Tr. 9:14-15.

Fed. R. Evid. 410(a) provides that "[i]n a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions: (1) a guilty plea that was later withdrawn; (2) a nolo contendere plea; (3) a statement made during a proceeding on either of those pleas under Federal Rule of

---

[3] "Transcript dated Feb. 29, 2016" refers to the transcript of the hearing, conducted out of the presence of the jury, during which the Court made inquiries of the counsel representing Mr. Payton at the time of his guilty plea (see infra). "Trial Transcript" refers to the transcript of the SEC v. Payton and Durant trial.

Criminal Procedure 11 [which covers pleas] . . ." On its face,
Rule 410 allows for only two, limited exceptions:

> The court may admit a statement described in Rule
> 410(a)(3) . . . . (1) in any proceeding in which another
> statement made during the same plea or plea
> discussions has been introduced, if in fairness the
> statements ought to be considered together; or (2) in
> a criminal proceeding for perjury or false statement,
> if the defendant made the statement under oath, on the
> record, and with counsel present.

Fed. R. Evid. 410(b).

The Court denied the SEC's motion in limine, for several
reasons. First, the SEC's proposed uses did not fall within the
exceptions permitted by Rule 410. Although the SEC argued that
Rule 410 was inapplicable because Mr. Payton did not "withdraw"
his guilty plea, see SEC Mot. in Limine Br. at 6-8, Mr. Payton's
guilty plea was vacated after he moved for such relief, and any
possible distinction between Mr. Payton's situation and that of
one who "withdraws" his plea did not materially affect Rule
410's application for current purposes.

Second, the legislative history of Rule 410 bolstered the
conclusion that Rule 410 mandates the exclusion of Mr. Payton's
plea allocution statements. As the Second Circuit explained in
United States v. Lawson, 683 F.2d 688 (2d Cir. 1982), the Senate
in 1974 proposed an addition to Fed. R. Evid. 410 by which that
Rule "should not apply to the introduction of voluntary and
reliable statements made in court on the record in connection

10

with (an offer to plead guilty) where offered for impeachment purposes or in a subsequent prosecution of the declarant for perjury or false statement." Lawson, 683 F.2d at 692. The Report of the Senate Committee on the Judiciary accompanying the Senate's version of the proposed amendment explained that the House of Representatives' alternative version of Rule 410 would "render inadmissible for any purpose statements made in connection with" pleas of guilty or nolo contendere that are subsequently withdrawn. S. Rep. No. 93-1277, at 7057 (1974). The Senate Committee Report then highlighted the difficulties with the House of Representatives' approach:

> Of course, in certain circumstances such statements should be excluded. If, for example, a plea is vitiated because of coercion, statements made in connection with the plea may also have been coerced and should be inadmissible on that basis. In other cases, however, voluntary statements of an accused made in court on the record, in connection with a plea, and determined by a court to be reliable should be admissible even though the plea is subsequently withdrawn. This is particularly true in those cases where, if the House rule were in effect, a defendant would be able to contradict his previous statements and thereby lie with impunity.

Id. "To prevent such an injustice," the Senate Committee Report continued, Rule 410 was "modified to permit the use of such statements for the limited purposes of impeachment and in subsequent perjury or false statement prosecutions." Id.

11

So far as impeachment was concerned, however, the Senate's point of view did not prevail. See Lawson, 683 F.2d at 692-93. Instead, first by an amendment to Fed. R. Crim. P. 11(e)(6), and then ultimately by enacting the current wording of Fed. R. Evid. 410, Congress opted to permit the use of statements made in connection with withdrawn guilty pleas in perjury prosecutions, but not for impeachment. See Pub. L. No. 94-64, 89 Stat. 370 (1975); Pub. L. No. 94-149, 89 Stat. 805 (1975).[4] In doing so, Congress adopted the House of Representatives' approach. See H.R. Conf. Rep. 94-414, at 10; Lawson, 683 F.2d at 693.

While legislative history must always be approached with caution, it is hard to imagine legislative history that more clearly evidences Congress's intent to prohibit the use for impeachment purposes of statements made in connection with a withdrawn guilty plea. See Lawson, 683 F.2d at 693; United States v. Udeagu, 110 F.R.D. 172, 175 (E.D.N.Y. 1986). For these reasons, the Court denied the SEC's motion to use Mr. Payton's guilty plea statements for impeachment purposes.

This limitation, however, only served to highlight the need for the Court to examine with care any testimony by Mr. Payton that was inconsistent with his plea allocution, since a referral

---

[4] Today, the Federal Rules of Criminal Procedure provide that "[t]he admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410." Fed. R. Crim. P. 11(f).

12

by the Court of any perceived perjury would be one of the few safeguards remaining to wanton disregard for prior statements made under oath. Indeed, Mr. Payton's counsel effectively invited such scrutiny when, in opposing the SEC's motion in limine to introduce Mr. Payton's plea allocution statements for impeachment purposes, he stated:

> [Fed. R. Evid.] 410 balances competing concerns about trying to encourage plea discussions and pleas on the one hand and a recognition that in subsequent proceedings you want to ensure that people tell the truth. 410 allows you to prosecute someone for perjury if in a subsequent proceeding you take a materially inconsistent position and the government wants to refer it for criminal prosecution and my client is fully informed about that risk. . . . there's a sword hanging over our client's head if he testifies in a 180-degree different way from what he said in his plea allocution.

Transcript of Oral Argument dated Feb. 1, 2016, 47:14-21, 50:15-18.

Yet, before long, such seeming inconsistencies appeared to emerge. Specifically, Mr. Payton's trial testimony, as here relevant, proceeded as follows. Mr. Payton was asked by the SEC's counsel: "Before you traded, you learned that SPSS was going to be acquired; correct?" Tr. 459:4-5. Mr. Payton responded:

> Yes. Before I traded – I'm not sure, you know, if I even at that point recognized, you know, SPSS per se, but the whole idea was a buyout. . . . The idea that was brought to me by Tom was about a company that was, you know, potentially going to be bought out. So, you

13

> know, after that when I actually followed up and
> talked to Ben [Durant] about the idea, I then learned
> that it was SPSS, that is what was brought to me, yes.

Tr. 459:6-8, 13-17. When asked again whether he knew that SPSS
was the target of a buyout or acquisition before he traded, Mr.
Payton responded: "That is the rumor; that is what was shared to
me by Tom Conradt." Tr. 459:22-23. The SEC's counsel then asked
Mr. Payton whether he thought the SPSS information about the
buyout was material before he traded on July 22, 2009, and Mr.
Payton responded "Did I think it was material? I did not know
for certain, you know, what it was. I knew that, you know -- "
Tr. 459:24-460:2.

The Court then called a sidebar to inquire into whether
materiality was at issue in the case, given earlier indications
that it was not. See Tr. 461-465. After questioning resumed, the
SEC's counsel asked Mr. Payton: "Before you traded on July 22nd,
Tom Conradt had told you that his roommate had told him that IBM
would soon be acquiring SPSS, correct?" Tr. 467:23-25. Mr.
Payton answered "I don't - I don't remember that precise detail
that he shared." Tr. 468:1-2. The following exchange then took
place:

> Q [SEC's counsel]: . . . Before you traded, Tom
> Conradt had actually said "my roommate told me that
> IBM would soon be acquiring SPSS"; isn't that right?
>
> A: I don't recall Tom specifically saying that, you
> know, that his roommate told him. You know, I just

14

remember the gist of my conversation with Tom was that there was a buyout, and that, ultimately, I did understand SPSS was the target.

Q: Let me ask it this way: When you say you don't recall that happening, are you saying that didn't happen or you don't remember if that happened?

A: I'm saying Tom said a lot of things, and it's certainly possible. You know, some of those things are possible but I'm saying I don't remember, for me right here sitting here, to say, you know, before I made that trade, this is specifically what Tom told me. I just can't say that.

Tr. 468:15-469:4. Shortly thereafter the SEC's counsel attempted to refresh Mr. Payton's recollection by showing him his guilty plea allocution, but the attempt was unsuccessful, and pursuant to the Court's ruling on the SEC's motion in limine, the allocution was neither read nor shown to the jury. See Tr. 469:22-472:5.

At the time, Mr. Payton's foregoing trial testimony appeared to the Court to be materially inconsistent with his plea colloquy statements.[5] In particular, Mr. Payton had stated at his plea hearing that "[o]ne of the brokers at the brokerage

---

[5] Unlike earlier perjury statutes, such as 18 U.S.C. § 1621, the new perjury statute, 18 U.S.C. § 1623, does not require the Government, in indicting a defendant for perjury, to specify which declaration is false, as long as "(1) each declaration was material to the point in question, and (2) each declaration was made within the period of the statute of limitations for the offense charged under this section." 18 U.S.C. § 1623(c); see United States v. Housand, 550 F.2d 818, 823 & n.9 (2d Cir. 1977) ("The recent false declarations statute provides that where the defendant under oath has made two declarations which are inconsistent to the degree that one of them is necessarily false, the indictment need not specify which declaration is false, and mere proof of the contradiction is enough for conviction, 18 U.S.C. s 1623(c)").

firm told me his roommate told him that IBM would soon be acquiring a software company called SPSS at a specific price per share"; that "I understood that once this acquisition was announced, the price of SPSS shares would rise dramatically"; and that "[g]iven the specificity of the information, it was apparent that this information was obtained in breach of fiduciary duty." Payton Plea Tr. 28:13-25. Later on in the plea hearing, Mr. Payton further stated that "[Tom Conradt] specified that the company, IBM, would be the likely acquirer of SPSS – sorry, that he spoke to IBM about specifically purchasing SPSS at a particular share price." Payton Plea Tr. 35:22-25.

These statements seemed plainly at odds with such statements in Mr. Payton's trial testimony as, for example, that before he traded, he was "not sure" if he "even at that point recognized, you know, SPSS per se," Tr. 459:6-7; that it was a "rumor" that SPSS was the target of a buyout, Tr. 459:20-22; and that he "did not remember the precise detail" that Tom Conradt's roommate had told Mr. Conradt that IBM would soon be acquiring SPSS, Tr. 467:23-468:2.

Accordingly, the Court felt obliged to pursue further the possibility of perjury, even without reference to the special circumstances presented by Fed. R. Evid. 410. A trial court is not a mere "bump on a log," United States v. Pisani, 773 F.2d

16

397, 403 (2d Cir. 1985), when it comes to combatting the
perversion by possible perjury of a court proceeding's truth-
finding function. To the contrary, there is a long history of
courts, in appropriate cases, referring possible perjury to
prosecutors for investigation or of supporting such a remedy.[6]
For the same reasons, a court, in circumstances in which the
court believes that the truth-finding processes are being
abused, is fully authorized to make inquiries outside of the
presence of the jury. As one trial court explained, it conducted
an evidentiary hearing outside the presence of the jury
partially "to address its ethical obligation to determine
whether a reasonable basis existed to believe that [a trial
witness] had committed the crime of perjury." In re Actos, 2014
WL 2624943, at *4.[7]

---

[6] See, e.g., The Reno, 61 F.2d 966, 968 (2d Cir. 1932); United States v.
Comiskey, 460 F.2d 1293, 1294 (7th Cir. 1972). For some recent examples of
perjury referrals, see Ades v. 57th St. Laser Cosmetica, LLC, No. 11-cv-8800,
2013 WL 2449185, at *13 (S.D.N.Y. June 6, 2013); Mackler Prods., Inc. v.
Turtle Bay Apparel Corp., 92-cv-5745, 1997 WL 269505, at *4 (S.D.N.Y. May 21,
1997), vacated on other grounds sub nom. Mackler Prods., Inc. v. Cohen, 146
F.3d 126 (2d Cir. 1998); Neal v. LaRiva, 765 F.3d 788, 791 (7th Cir. 2014).
One court explained that it "interprets the Code of Conduct for United States
Judges - known as the judicial canons of ethics - as requiring this Court,
should it develop a reasonable basis for believing that the criminal act of
perjury has occurred, to refer the matter to the United States Attorney's
Office for handling by that representative of the Administrative Branch of
the United States Government." In re Actos (Pioglitazone) Products Liab.
Litig., No. 12-cv-0064, 2014 WL 2624943, at *5 (W.D. La. June 11, 2014).

[7] See also Li v. Canarozzi, 142 F.3d 83, 85 (2d Cir. 1998) (describing trial
court's inquiry, outside the presence of the jury, into whether a witness had
given truthful testimony at his deposition, for the purposes of determining
whether the witness was unavailable and whether his deposition should be
admitted into evidence); Barnett v. Norman, 782 F.3d 417, 423 (9th Cir. 2015)
(when a witness refuses to testify, a trial judge "can take a recess and

This Court therefore dismissed the jury and, outside the presence of the jury, began its own questioning of Mr. Payton. See Tr. 473:2-476:7. At the outset, the Court explained the purpose of the questioning, stating that the Court had an "independent, of course, obligation to make an inquiry out of the hearing of the jury if [it] think[s] perjury is occurring." Tr. 473:11-13. Only after the Court finished its line of questioning did Mr. Payton's counsel object.[8] The Court, while overruling his objection, did thereupon allow Mr. Payton's counsel to put his own questions to his client. See Tr. 477:1-12. In response to these questions – which raised issues about the circumstances under which Mr. Payton had made the statements in his plea allocution – the Court resumed its questioning of Mr. Payton (again outside the presence of the jury), see Tr. 477:15-478:10, 515:7-518:24, seeking to determine whether there was an innocent explanation for the seeming inconsistency.

---

inquire outside the presence of the jury whether something is impeding truthful testimony."); cf. Harris v. Steelweld Equip. Co., 869 F.2d 396, 402 (8th Cir. 1989)(rejecting the claim that the district court prejudiced their case by "ordering the jury out while the court lectured [a witness] in regard to lying in federal court," since "the judge was trying to control the evidence and the witnesses in the courtroom and simply took the required corrective measure outside the presence of the jury in order to correct the deliberate inconsistencies in the testimony of the witness.").

[8] When Mr. Payton's counsel belatedly did object, he cited no authority for the proposition that the Court was barred from conducting an inquiry into possible perjury outside the presence of the jury, nor any other ground for his objection.

Mr. Payton then offered two possible explanations for the apparent inconsistencies, and a third was later offered by his counsel. The first explanation was that Mr. Payton's memory of Mr. Conradt's statements to him about IBM's impending acquisition of SPSS was not as clear at trial as it had been on the day of his plea. See Tr. 474:5-9; 475:10-15. The Court finds this explanation unpersuasive and, indeed, itself bordering on the incredible. Mr. Payton pled guilty in November 2014 and testified at trial in February 2016. Mr. Payton told this Court that at his plea, he remembered that Mr. Conradt told him that IBM would acquire SPSS at a specific price per share. See Tr. 475:12-15. Indeed, Mr. Payton explained that at the time of his plea, he "was confident" that his statements about what Mr. Conradt told him "were true." Tr. 474:5-6; see 473:14-19. Some fifteen months later, however, despite being focused on preparing for the trial,[9] Mr. Payton would have the Court believe that he was now unable to "remember Tom specifically telling [him] any specific price per share." Tr. 475:6-7. The mere passage of 15 months cannot plausibly account for such a glaring inconsistency.

Mr. Payton's second explanation for the inconsistencies was that his plea allocution was initially a written statement

---

[9] In their letter submitted after the trial, Mr. Payton's counsel noted that in the year following his plea, Mr. Payton "had the opportunity to review contemporaneous documents and spend numerous hours with counsel to figure out what precisely he remembered Conradt saying and when." Payton Post-Trial Letter at 4.

prepared by his attorneys, who made additions to the statement while the plea hearing was taking place. See Tr. 477:1-9; 478:1-10. In particular, Mr. Payton said he believed that notes passed to him by his counsel at the plea hearing related to his statement that "[o]ne of the brokers at the brokerage firm told me his roommate told him that IBM would soon be acquiring a software company called SPSS at a specific price per share, and that we should invest in this stock." Tr. 478:1-6; see 473:14-19. Mr. Payton also vaguely indicated that he remembered a Post-It note was written at the time of the allocution and "was also included." Tr. 478:8-10.

To explore this possibility, the Court, on February 29, 2016, while the jury was deliberating, held a hearing with Mr. Payton's former counsel, who had represented him at his plea.[10] Those counsel duly appeared at that hearing and were represented by their own counsel. See Feb. 29 Tr. at 7:7-8:23. After explaining the context and purpose, the Court put to them the following questions: "During the court proceeding, did you hand a Post-it or some way or another make some change [to the written allocution]? If so, was it with respect to that sentence?[11]" Feb. 29 Tr. 14:7-9. Mr. Payton's former counsel

---

[10] Mr. Payton's current counsel objected to this procedure, see Feb. 29 Tr. at 5:2-8, but did not cite any authority to support his objection.

[11] "That sentence" referred to the following sentence in Mr. Payton's plea allocution: "One of the brokers at the brokerage firm told me his roommate told him that IBM would soon be acquiring a software company called SPSS at a

stated that they had no memory of whether a Post-It note was
handed to the defendant during the plea colloquy, but that they
did recall that there was colloquy between them and their client
during the course of the plea allocution, see Feb. 29 Tr. 22:4-
13. However, after consultation with Mr. Payton and his current
counsel, his former counsel invoked attorney-client privilege
and work-product doctrine as to the contents of statements to
Mr. Payton that appeared on any such Post-It or other note, as
well as to the contents or production of any drafts of the
written plea-allocution statement. See Feb. 29 Tr. 25:2-6. While
rejecting the invocation of the work-product doctrine and
expressing the belief that the attorney-client privilege might
well have been waived by Mr. Payton's prior responses to the
Court, the Court chose to uphold the invocation of the attorney-
client privilege for the purposes at hand, without prejudice to
the waiver issue being revisited by this or another court at
some future time. See Feb. 29 Tr. 15:22-16:2, 17:14-16, 19-21,
25:7-13.

The Court draws no adverse inference from this invocation
of attorney-client privilege. But the invocation means that
there is no affirmative evidence, other than Mr. Payton's vague
recollection about his attorneys' involvement in his allocution,
to suggest that what Mr. Payton stated under oath at one of the

---

specific price per share and that we should invest in this stock." Payton
Plea Tr. 28:14-18; see Feb. 29 Tr. 13:24-14:4.

21

most important proceedings of his life, his guilty plea, was not an accurate representation of his memory. The Court, therefore, has no basis upon which to infer that the inconsistencies between Mr. Payton's plea allocution and his trial testimony are a result of his former counsel's putting words in his mouth or anything remotely like that.

The Court thus turns to a third alleged explanation for the inconsistencies between Mr. Payton's plea allocution and his trial testimony – not an explanation that he offered himself but that was offered by his counsel in their post-trial letter. Mr. Payton's counsel asserts that Mr. Payton's allocution, when read as a whole, was itself somewhat equivocal on the points of alleged inconsistency with Mr. Payton's trial testimony. See Payton Post-Trial Letter at 3. For example, Mr. Payton testified at trial that he could not "definitively remember" whether he knew before trading that the information about IBM's acquisition of SPSS was inside information that was supposed to be kept confidential, see Tr. 484:9-14, despite having stated in his plea allocution that he "understood that this [information] was supposed to be kept confidential." Payton Plea Tr. 28:25-29:1. Mr. Payton's post-trial letter explains this apparent inconsistency by stating that "it is not entirely clear from the plea allocution that Mr. Payton had this understanding prior to, as opposed to after, trading." Payton Post-Trial Letter at 3.

22

The Court finds this interpretation of the plea allocution to be highly doubtful. It is true, as Mr. Payton's counsel points out, that in Mr. Payton's plea allocution, "I understood that this was inside information" technically follows "[a]fter the deal was announced." See Payton Plea Tr. 28:21-22; 28:25-29:2; Payton Post-Trial Letter at 3. However, the plea allocution casts Mr. Payton's understanding that the information was obtained in breach of fiduciary duty, and was supposed to be kept confidential, as a consequence of the "specificity of the information." See Payton Plea Tr. 28:23-29:1. The plea allocution also makes clear that Mr. Payton was aware of the specific information about IBM's acquisition of SPSS before he traded. See Payton Plea Tr. 28:14-22. The plain inference is that Mr. Payton was aware of the confidential nature of the information before he traded, and there is no basis for concluding, based on the plea allocution, that Mr. Payton's understanding was different between the times before and after he traded.

Moreover, Mr. Payton's counsel's interpretation of the plea allocution as to the confidentiality point does not explain other material inconsistencies in Mr. Payton's testimony. Notably, there was nothing equivocal about Mr. Payton's statement at his guilty plea allocution that Mr. Conradt "told me his roommate told him that IBM would soon be acquiring a

software company called SPSS at a specific price per share,"
Payton Plea Tr. 28:15-17, or that "I understood that once this
acquisition was announced, the price of SPSS shares would rise
dramatically," Payton Plea Tr. 28:18-19. However, as explained
supra, Mr. Payton gave materially inconsistent testimony on
these subjects at trial. See Tr. 468:11-13, 18-19, 474:7-9,
459:20-23, 459:24-460:2. In sum, the Court is not persuaded that
Mr. Payton's plea allocution was equivocal on key points of
inconsistency between the plea and his trial testimony.

Nevertheless, the Court recognizes some countervailing
reasons not to refer Mr. Payton to the U.S. Attorney's Office
for a possible perjury prosecution. First, since the areas of
inconsistency were, in the Court's view, significant to the
SEC's case against Mr. Payton, the Court finds it likely that
the jury would not have found Mr. Payton liable if it had fully
credited his testimony at trial. However, the jury did find Mr.
Payton liable, so in that respect any perjury by Mr. Payton that
occurred in the trial did not ultimately undermine the workings
of the legal process. See Corniele, 171 F.3d at 751 ("many
[untruthful statements in a civil trial] essentially are
resolved by adverse jury verdicts, leaving for criminal
prosecution those few instances where a witness' lie is so
material to the truth-seeking function of a trial that the

prosecutor (sometimes, upon the referral of the trial judge) elects to seek an indictment.").

Second, as a consequence of Mr. Payton's having been found liable, he faces substantial civil penalties. See SEC Damages Letter dated March 7, 2016, Dkt. 144; Payton Damages Letter dated March 14, 2016, Dkt. 147. So, in a rough sense, he will receive some adverse consequence from his seeming perjury.

Third, a Court should be very cautious about making such a referral and should do so only in exceptional cases, since, as this Court previously stated in another case, the threat of a perjury referral, if frequently invoked, might "have a chilling effect on civil litigants who wish to testify in suspicious circumstances." Antidote Int'l Films, Inc. v. Bloomsbury Pub., PLC, No. 06-cv-6114, 2007 WL 1834839, at *2 (S.D.N.Y. June 26, 2007).

Fourth, because a formal perjury referral from a federal judge carries heavy weight, it may impede the prosecution from exercising its own independent judgment as to whether perjury has occurred or whether, even if it has, criminal prosecution is appropriate. This last consideration takes on a special meaning in this case, given that the plaintiff, the SEC, is itself a government entity. It may be unrealistic to believe that prevailing private parties to a civil suit will refer matters to

the U.S. Attorney's Office for possible perjury prosecution or that, even if they do, that the U.S. Attorney's Office will pursue such an investigation. In the instant case, however, the plaintiff is a government agency that has frequently worked closely with the U.S. Attorney's Office. Indeed, this very case involved parallel civil and criminal suits. Nothing stops the SEC from asking the U.S. Attorney's Office to investigate whether Mr. Payton engaged in perjury, and it is to be expected that such a referral would be taken seriously.

Taking account of all these factors, and notwithstanding the seemingly glaring inconsistencies between Mr. Payton's plea allocution and his trial testimony, the Court is persuaded not to formally refer Mr. Payton to the U.S. Attorney's Office for a possible perjury prosecution. Whether the SEC will choose to make its own referral is left to that agency's discretion.

SO ORDERED.

Dated:    New York, NY
          April 4, 2016                    JED S. RAKOFF, U.S.D.J.

**Debevoise**
**&Plimpton**

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
+1 212 909 6000

March 3, 2016

**BY EMAIL**

The Honorable Jed S. Rakoff
United States District Judge
Room 1340
United States Courthouse
500 Pearl Street
New York, NY 10007

*Re:*   *SEC v. Payton et al.*, No. 14 Civ. 4644 (JSR)

Dear Judge Rakoff:

We write at the Court's invitation to urge the Court to refrain from making a referral to the U.S. Attorney's Office ("USAO") to investigate possible perjury based on Daryl Payton's trial testimony concerning what Thomas Conradt told him about SPSS.

At the February 29 hearing, the Court identified several statements in Mr. Payton's plea allocution that it felt "might be viewed as materially inconsistent" with his trial testimony. *See* Feb. 29, 2016 Hearing Tr. ("Hearing Tr.") at 9-14. In relevant part, Mr. Payton stated in his plea allocution:

> ...One of the brokers at the brokerage firm told me his roommate told him that IBM would soon be acquiring a software company called SPSS at a specific price per share and that we should invest in this stock. I understood that once this acquisition was announced, the price of SPSS shares would rise dramatically. I purchased, from Manhattan, on a national securities exchange, options of SPSS based on this information. After the deal was announced I sold my options for a profit. Given the specificity of the information, it was apparent that this information was obtained in a breach of fiduciary duty. In other words, I understood that this was inside information that was supposed to be kept confidential and that it was illegal for me to trade on.

Plea Allocution at 28-29 (Nov. 6, 2014). In response to a follow up question from Judge Carter, Payton further stated that "[Conradt] specified that the company, IBM, would be the likely acquirer of SPSS -- sorry, that he spoke to IBM about specifically purchasing SPSS at a particular share price." *Id.* at 36.

In light of the plea allocution, the Court took issue with the following portions of Mr. Payton's trial testimony:

> Q. ... Before you traded, you knew that SPSS was the target of a buyout or an acquisition?

1

> A. That is the rumor; that is what was shared to me by Tom Conradt.

Tr. 459:20-23.

> Q. Before you traded on July 22nd, you thought that the SPSS information about the buyout was material?
>
> A. Did I think it was material? I did not know for certain, you know, what it was. I knew that, you know –
>
> THE COURT: I'm sorry. Forgive me. Counsel, would you approach the sidebar.

Tr. 459:24-460:4. (The Court then called a sidebar to discuss whether materiality was in dispute.).

> Q. ... Before you traded, Tom Conradt had actually said my roommate told me that IBM would soon be acquiring SPSS; isn't that right?
>
> A. I don't recall Tom specifically saying that, you know, that his roommate told him. You know, I just remember the gist of my conversation with Tom was that there was a buyout, and that, ultimately, I did understand SPSS was the target.
>
> Q. Let me ask it this way: When you say you don't recall that happening, are you saying that didn't happen or you don't remember if that happened?
>
> A. I'm saying Tom said a lot of things, and it's certainly possible. You know, some of those things are possible, but I'm saying I don't remember, for me right here sitting here, to say, you know, before I made that trade, this is specifically what Tom told me. I just can't say that.

Tr. 468:15-469:4.

None of this testimony merits a referral. First, Mr. Payton's trial testimony that Mr. Conradt "shared with him" that "SPSS was the target of a buyout or an acquisition," Tr. 459:20-23, is consistent with his plea allocution that "[o]ne of the brokers at the brokerage firm told me his roommate told him that IBM would soon be acquiring a software company called SPSS at a specific price per share and that we should invest in this stock." Plea Allocution at 28. The fact that Mr. Payton at trial characterized the information conveyed by Mr. Conradt as a "rumor" does not negate the substance of what he readily acknowledged.

Second, Mr. Payton's answer about materiality that was called into question at the hearing, *see* Hearing Tr. 11:2-4, was cut off by the sidebar called by the Court. Tr. 459:24-460:4. This incomplete response cannot serve as the basis for a perjury referral, especially

since after the sidebar, when the SEC asked the question again, Mr. Payton testified, "I thought it could be material." Tr. 467:9.

Third, Mr. Payton never denied at trial that Mr. Conradt told him that IBM would soon be acquiring SPSS for a specific price. Mr. Payton testified repeatedly that it was certainly possible Conradt said as much, but only that he did not have a specific recollection in February 2016 of Conradt telling him this precise information seven years ago. *See, e.g.*, Tr. 468:22-469:4 ("I'm saying Tom said a lot of things, and it's certainly possible. You know, some of those things are possible, but I'm saying I don't remember, for me right here sitting here, to say, you know, before I made that trade, this is specifically what Tom told me. I just can't say that."); Tr. 474:5-9 ("At the time that I made the statements, I was confident that they were true. As I'm being asked today, I'm just saying that the specificity that he just kind of shared with me specifically, I can't say that I remember exactly. It's certainly possible."); Tr. 486:25-487:6 ("I don't know or remember, per se, that IBM was specifically the company. Like I said, this has been many, many years, and, you know, yeah, certainly, that's something that Tom could have said. I don't remember specifically at that moment knowing that it was IBM. My focus was the fact that I knew this company was definitely, you know -- the buyout rumor was what the focus of the trade was."); Tr. 488:5-8 ("Yet again, sir, I don't remember specifically him giving me an exact price necessarily. You know, he could have shared, you know, that information at some point. I just don't remember specifically, you know, when that occurred.").

Nor do any other portions of Mr. Payton's trial testimony merit a referral. The SEC asked Mr. Payton whether he understood prior to trading that the SPSS information was "inside information" that was "supposed to be kept confidential." Tr. 484:9-10; 485:25-486:12. These questions call for a legal conclusion and are so fundamentally ambiguous on their face that any answers given in response are unlikely to support a finding of perjury. *See United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986).

Furthermore, it is not entirely clear from the plea allocution that Mr. Payton had this understanding prior to, as opposed to after, trading. *See* Plea Allocution at 28-29 ("*After* the deal was announced I sold my options for a profit. Given the specificity of the information, it was apparent that this information was obtained in a breach of fiduciary duty. In other words, I understood that this was inside information that was supposed to be kept confidential and that it was illegal for me to trade on.") (emphasis added). In addition, embedded in the word "understood," as opposed to "thought" or "believed," is the assumption that Mr. Payton knew something to be true and that his understanding was in fact correct. *See, e.g.*, Black's Law Dictionary (10th ed. 2014) (defining "understand" as "to apprehend the meaning of; to know"). By the time of trial, Mr. Payton was aware that his guilty plea had been vacated due to *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), precisely because in some instances it is permissible to trade on material, non-public information, *i.e.*, to not keep the information confidential. After his plea and before taking the stand at trial, Mr. Payton also learned facts about the circumstances under which the SPSS information was conveyed to Conradt – including Trent Martin's testimony that Michael Dallas had given Trent Martin the SPSS information to trade on – which undermined Mr. Payton's previous understanding (*i.e.*, that he *knew*) that the information was supposed to be kept confidential.

In any event, Mr. Payton acknowledged that he very well could have had this understanding prior to trading, but that he just could not recall it seven years later. Tr. 484:11-14

3

("I mean, that doesn't surprise me, but, you know, as I'm sitting here remembering whether or not it was supposed to be kept confidential, you know, before trading is not something that I can say, yeah, I definitely remember."); Tr. 485:5-8 ("I don't remember Tom specifically saying that [this was information that was supposed to be kept confidential]. It's certainly possible. Sir, it's been seven years. I'm trying to tell you, you know, as I answer your questions to the best of my ability in this moment."); Tr. 486:3-9 ("I don't know that -- the way you characterize that statement, I don't think that I can just say that I agree to that, that I knew it was inside information. I knew it would be material nonpublic if the buyout actually transpired. I didn't know the source, so I'm not sure that I can say, you know, that I -- I can just agree to that statement as you read it to me."); Tr. 486:15-19 ("What I'm saying is, I can't say that I -- you know, in trading, that I knew this information was inside information. I knew it was material nonpublic if it actually transpired, you know, the way it had been presented to me.").

The SEC also repeatedly asked, "Before you traded, you were aware that it would be *improper* to trade on this information if the buyout actually occurred; isn't that correct?" Tr. 489:12-14, 20-24 (emphasis added). Mr. Payton answered this confusing and ambiguous question as best he could, "I knew that if I traded on the information that came from an improper source or was secured in an improper way, that that would be inappropriate behavior. In terms of certainty regarding this particular, you know, piece of information, this transaction, I didn't have that certainty." Tr. 489:12-19. When pressed for a yes or no answer, it was in this context that he stated "no." Tr. 489:20-25. It is worth noting that *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), which clarified the required elements for illegal trading on inside information, was decided after Mr. Payton's deposition and plea allocution, but before his trial, and thus adds another layer of confusion to what the SEC meant by "improper."

Testimony resulting from confusion, mistake, or faulty memory cannot support a perjury conviction. *See United States v. Dunnigan*, 507 U.S. 87, 95 (1993) (finding inconsistent testimony that is merely a result of confusion, mistake, or faulty memory is not intentional perjury for purposes of § 1621), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997); *United States v. Thompson*, 808 F.3d 190, 194 (2d Cir. 2015) (18 U.S.C. § 1621 is violated if "a witness testifying under oath or affirmation gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." (internal quotations and alterations omitted)); *United States v. Dean*, 55 F.3d 640, 659 (D.C. Cir. 1995).

That Mr. Payton's memory is unclear on these points is understandable. He was testifying at trial about conversations that took place in the summer of 2009, over seven years ago. His plea allocution occurred on November 6, 2014, over a year ago. In the year that followed his plea, Mr. Payton had the opportunity to review contemporaneous documents and spend numerous hours with counsel to figure out what *precisely* he remembered Conradt saying and when. Conradt's testimony does not materially contradict Payton's trial testimony; he testified, *inter alia*, that he learned the specific price per share after Payton traded. *See* Tr. 276:14-277:5. Nor does it provide reason to doubt the difficulty of remembering these casual conversations that occurred seven years ago. *See, e.g.*, 316:22-317:1 ("Like I was just saying before, it's seven years, and it's super, super hard sometimes to clarify exactly what happened on every conversation. These were casual conversations between friends. So, I believe I may have said roommate or Trent. It's possible, I just don't remember with any certainty.").

4

Moreover, since Mr. Payton did not dispute that he in fact traded on material, nonpublic SPSS information for purposes of the trial, he had little reason to intentionally lie at trial about what specific SPSS information he could remember Conradt telling him seven years earlier.

Finally, in November 2014, Mr. Payton read his plea allocution from a written statement prepared by his counsel pursuant to a plea deal with the USAO. During the plea proceeding, the original prepared statement was amended with a Post-It note. It is not surprising that this formal statement does not perfectly align with his trial testimony, which was made in response to rapid-fire cross-examination by both the SEC and the Court.[1] As the Court well knows, plea deals, and the allocutions required to obtain them, bring distinct pressures to bear, including those of timing and asymmetrical information. *See generally* Jed S. Rakoff, "Why Innocent People Plead Guilty," New York Review of Books (Nov. 20, 2014) ("If his lawyer can obtain a plea bargain that will reduce his likely time in prison, he may find it 'rational' to take the plea.").

For all the above reasons, Mr. Payton's trial testimony does not warrant a perjury referral.

Respectfully,

Matthew Fishbein
Sean Hecker

cc:    All Counsel of Record (By Email)

---

[1]    For the record, we reassert our objections to the authority of the Court to conduct an interrogation of our client on February 24, 2016, in the middle of the SEC's cross-examination, while our client was on the stand and under oath, and the Court's subsequent hearing with Mr. Payton's former criminal defense counsel on February 29, 2016 as to the circumstances under which Mr. Payton pled guilty.



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
PHILADELPHIA REGIONAL OFFICE
1617 JFK Boulevard, Suite 520
Philadelphia, Pennsylvania 19103

David L. Axelrod
Regional Trial Counsel
(215) 861-9625
axelrodd@sec.gov

March 7, 2016

*Via Electronic Mail*

The Honorable Jed S. Rakoff
United States District Judge
Room 1340
United States Courthouse
500 Pearl Street
New York, NY 10007

      Re:    *SEC v. Payton et al.,* No. 14-cv-4644 (JSR)

Dear Judge Rakoff:

Plaintiff, the United States Securities and Exchange Commission, hereby submits this letter responding to defendant Daryl Payton's letter of March 3, 2016, in order to correct certain aspects of the record mischaracterized in defendant's letter and to assist the Court in its analysis of Payton's statements. A careful analysis of these statements casts doubt on defendant's claims that his trial testimony was truthful.

In light of the Court's ruling based on Federal Rule of Evidence 410, the SEC was not permitted to introduce into evidence any of defendant Daryl Payton's statements made during his November 2014 plea colloquy (as the plea was later vacated), or to impeach the inconsistent statements he made at trial through use of that plea colloquy. Instead, as the Court noted, the only remedy available is a referral for perjury. *See* Feb. 29, 2016 Trial Tr. at 9:7-9:21. Indeed, as the Court stated:

> Mr. Payton, on examination by the SEC, gave answers that might be viewed as materially inconsistent with what he had said under oath at his allocution. He described what he had been told by Mr. Conradt as a rumor; that's at page 459:line 22. He, in answer to whether he thought it was material, said he did not know for certain. That's at page 460/lines 1 and 2. He gave other statements that were infinitely more vague about what the information was that he had received, than what he had said in his allocution.

Feb. 29, 2016 Trial Tr. at 10:23-11:7.

The Honorable Jed S. Rakoff
Page 2

## Facts Readily Acknowledged By Defendant

First, defendant refers to information that he "readily acknowledged" during trial as a basis from which to conclude that his testimony does not merit a perjury referral. Specifically, defendant states that "the fact that Mr. Payton at trial characterized the information conveyed by Mr. Conradt as a 'rumor' does not negate the substance of what he readily acknowledged." But this begs the question as to what it is defendant now claims he did "readily acknowledge[]" at trial. Defendant's letter is surprisingly thin on this topic.

An examination of the actual testimony shows that Payton readily acknowledged almost nothing from his plea colloquy. For example, while Payton stated in his plea colloquy that he "understood that this was inside information that was supposed to be kept confidential" – he denied this at trial, even though he was questioned using his precise words from his colloquy.

> Q:   You understood before you traded that the SPSS information was inside information that was supposed to be kept confidential, correct?
>
> A:   I don't know that -- the way you characterize that statement, I don't think that I can just say that I agree to that, that I knew it was inside information. I knew it would be material nonpublic if the buyout actually transpired.  I didn't know the source, so I'm not sure that I can say, you know, that I -- I can just agree to that statement as you read it to me.
>
> Q:   Just so we're very clear, it's your testimony for this jury that you do not agree that you understood that this was inside information that was supposed to be kept confidential?
>
> A:   What I'm saying is, I can't say that I -- you know, in trading, that I knew this information was inside information.  I knew it was material nonpublic if it actually transpired, you know, the way it had been presented to me.

Feb. 24, 2016 Trial Tr. at 485:25-486:19 (overruled objection omitted).[1]

In the allocution Payton also stated that "Given the specificity of the information, it was apparent that this information was obtained in breach of fiduciary duty. In other words, I understood that this was inside information that was supposed to be kept confidential and that it was illegal for me to trade on." However, at trial, he denied even knowing it would be "improper" to trade on this information.

---

[1]      In his letter, defendant claims that these questions were unfair because they called for a legal conclusion and were "fundamentally ambiguous on their face." But neither is true. Instead they are questions using the precise phrasing that defendant himself used at his plea allocution.

The Honorable Jed S. Rakoff
Page 3

> Q:   Before you traded, you were aware that it would be improper to trade on
>      this information if the buyout actually occurred; isn't that correct?
>
> A:   No.

*Id.* at 489:22-489:25.[2]  He further denied any basis of knowing it had come from an inside
source.

> Q:   And did you have any knowledge at all that Trent Martin had obtained the
>      information improperly?
>
> A:   No, none at all.
>
> Q:   Or did you have any information that he had obtained the information
>      from an inside source?
>
> A:   No, no idea.

*Id.* at 581:7-581:12.


### The Use of the "Rumor" Characterization

Perhaps the most clear change between the statements in his plea colloquy and Payton's trial
testimony relates to his basic characterization of the information he had obtained from Conradt.
In sharp contrast to the statement he made during his plea colloquy, at trial Payton appeared to
claim that he had not had access to specific "inside information," and instead, he claimed, the
information he learned from Conradt was merely a "rumor."  For example:

> Q:   Before you traded, you knew that SPSS was the target of a buyout or an
>      acquisition?
>
> A:   ***That is the rumor***; that is what was shared to me by Tom Conradt.

*Id.* at 459:20-459:23 (emphasis added).

> Q:   Before you traded, did Tom Conradt tell you that it was going to happen in
>      the near future?

---

[2]     Of course, as demonstrated at trial, when the exact same question was posed to Payton
during his deposition (roughly 9 months before trial) – he actually said "yes."  Feb. 24, 2016
Trial Tr. at 490:1- 490:14.

The Honorable Jed S. Rakoff
Page 4

> A:    Yeah, Tom told me -- *that was his rumor*, that was the summation of what
>       he shared with me.

*Id.* at 489:1–489:4 (emphasis added).

> Q:    And this information that SPSS was going to be acquired by IBM, that
>       was nonpublic that you knew, and that it was going to happen soon, this
>       must have raised a lot of red flags for you, right?
>
> A:    Raised a lot of red flags?  The way it was proposed to me, there was
>       nothing, you know, out of the ordinary in terms of a *buyout rumor*, you
>       know, even if there's a price associated with it or whatever the case may
>       be.  Those things unto themselves are certainly – aren't going to raise red
>       flags.

*Id.* at 498:4-498:12 (emphasis added).

> Q:    Before you traded on July 22nd, you understood that SPSS was going to
>       be bought out, and you were attempting to get your money in the market
>       before that deal actually happened?
>
> A:    *I had been proposed a rumor specifically to SPSS*, and I had made a
>       decision, you know, to make a trade to speculate on it based -- you know,
>       based on the fact that my friend and analyst that I respected thought it was
>       a worthwhile speculation.

*Id.* at 499:21-500:2 (emphasis added).

This is just a sampling of the times during his testimony in which Payton referred to the
information from Conradt as merely a "rumor."  In total, Payton used the term "rumor"
approximately twenty times at trial.  Notably, he did not use the word once in his plea colloquy.
The incongruence between Payton's plea colloquy and his trial testimony was not lost on the
Court.  When, outside the presence of the jury, the Court asked Payton to clarify whether or not
he was intentionally describing the information differently at trial than he did during his plea
colloquy, Payton admitted that he was, and that he knew that the information was not simply a
rumor.

> COURT:   So, Mr. Payton, in your allocution, at page 28 in the statement that I
>          gather you say was being read, you state, "I understood that this was
>          inside information that was supposed to be kept confidential and that
>          it was illegal for me to trade on."  Do you remember making that
>          statement?

> WITNESS: I do.

The Honorable Jed S. Rakoff
Page 5

> COURT:    And was that statement true?
>
> WITNESS: It was true.
>
> COURT:    So, you knew it wasn't just a rumor, right?
>
> WITNESS: I did.
>
> COURT:    Pardon?
>
> WITNESS: At the moment, I did.

*Id.* at 515:7-515:20.[3]

Yet, despite acknowledging his testimony in Court was different than his truthful allocution, when he returned to the stand after lunch, and once again sat before the jury, Payton continued to classify the Conradt information as a "rumor." In fact, it only took him until the second question to do so:

> Q:    Sir, when you were deposed, didn't you actually say that you were
>       attempting to invest before the buyout actually occurred?
>
> A:    Yeah. I mean obviously if you're going to invest and *there's a buyout
>       rumor out there*, you know, most importantly *I was attempting to invest
>       before a rumor*, if it was legitimate, did catch on in the market.

*Id.* at 521:17-521:23 (emphasis added).

## Defendant's Answers Cannot be Explained by the Years Since the Events in Question

Ultimately, when not blaming the SEC's questions or the Court's procedures, defendant blames his inconsistent answers on faulty memory in light of the passage of time. First, this explanation fails because, as demonstrated above, for the key questions at issue, defendant did not state he did not remember, but instead gave substantive answers. The answers simply did not match the details to which he previously allocuted.

Second, where defendant did express a lack of recollection, defendant's letter characterizes this lack of memory as the product of the "seven years" since the events. But that is not the relevant time period by which to evaluate defendant's recollection – or lack thereof. The plea colloquy in which Payton clearly stated that he was told specific information regarding the impending SPSS acquisition (that he understood was inside information) was on November 6, 2014 – only six months before he was deposed, and only 15 months before trial. At that time, he made detailed

---

[3]     Defendants did not object to this inquiry by the Court until after this line of questioning.

The Honorable Jed S. Rakoff
Page 6

statements under oath based on what appeared to be a clear recollection. Any alleged lack of memory at trial only 15 months later should be judged against this timeframe.

Moreover, if his memory was indeed faulty, one would think his earlier, specific statements from the colloquy would have refreshed that memory – and he claimed they did not. *See* Feb. 24, 2016 Trial Tr. at 470:18-472:1. And indeed, defendant did not seem to suffer the same lack of memory of detail when questioned by his own counsel where it served his interest, for example in recalling the details of his meeting with Trent Martin for the first time. *Id.* at 551:16-552:15. Nor did he suggest any issues with his memory when testifying about the various things that he was *unequivocal* that Conradt had never told him about such as: where he lived, or with whom he lived (answering "No," when asked if he knew anything at all about Tom's living arrangements and stating "I had no idea where Tom lived") (*Id.* at 554:1-554:14); about any of the various problems he was having with his apartment or his efforts to remedy them ("He never talked about it") (*Id.* at 554:22-556:1); where his roommate worked ("I didn't know anything about him, no ") (*Id.* at 553:6-553:16); or about whether Conradt had shared any details about the help he had provided Martin after his arrest ("None whatsoever") (*Id.* at 556:2-556:15).

Based on the full record, the SEC believes it would be appropriate for the Court to refer Payton to the United States Attorney's Office for investigation of possible perjury.

Respectfully,

David L. Axelrod
Catherine E. Pappas
A. Kristina Littman
Scott A. Thompson

cc:   All Counsel of record (by Electronic Mail)