```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,      :
                                         :       14 Civ. 4644
        Plaintiff,                       :
                                         :       OPINION AND ORDER
        -v-                              :
                                         :
DARYL M. PAYTON, and                     :
BENJAMIN DURANT, III,                    :
                                         :
        Defendants.                      :
----------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

On February 29, 2016, following a seven-day trial, a jury found defendants Daryl M. Payton and Benjamin Durant, III civilly liable for insider trading. See Verdict, ECF No. 136. At the close of evidence, defendants Payton and Durant moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). See Trial Transcript ("Trial Tr.") at 880-89. The Court denied the motion. Id. at 889. Defendants Payton and Durant now move for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), or, in the alternative, for a new trial pursuant to Fed. R. Civ. P. 59. Defendants also seek amendment of the penalties imposed against them. For the reasons stated below, the Court hereby denies defendants' motion, except for one change in the penalties.

The factual background and procedural history of this case have been recounted in several prior opinions of this Court,

1

familiarity with which is here presumed.[1] To briefly summarize, the SEC pursued this case under the "misappropriation" theory of insider trading. See generally United States v. O'Hagan, 521 U.S. 642, 651-59 (1997). In 2009, Michael Dallas, a transactional lawyer working for IBM's outside law firm, learned in that capacity that IBM planned to acquire SPSS, Inc. ("SPSS"). Dallas then told his friend Trent Martin about the SPSS acquisition, but although this disclosure was made in strict confidence, Martin tipped his friend and roommate Thomas Conradt, and Conradt in turn tipped defendants Payton and Durant, who traded on the information.

Under Rule 50, "a court may set aside the verdict only if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." Cash v. Cty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011) (internal quotation marks omitted). In analyzing a Rule 50 motion, a court must review the entire record and draw all reasonable inferences in

---

[1] See SEC v. Payton, No. 14-cv-4644, 2016 WL 3023151 (S.D.N.Y. May 16, 2016); SEC v. Payton, 176 F. Supp. 3d 346 (S.D.N.Y. 2016); SEC v. Payton, 155 F. Supp. 3d 428 (S.D.N.Y. 2015); SEC v. Payton, 97 F. Supp. 3d at 558 (S.D.N.Y. 2015).

favor of the non-movant. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe," and should "give credence to the evidence favoring the nonmovant." Id. at 151 (internal quotation marks omitted).

The standard under Rule 59 is similarly strict. "A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Townsend v. Benjamin Enters., Inc., 679 F.3d 41, 51 (2d Cir. 2012).

Under Second Circuit law as it stood at the time of trial, the SEC was required to prove "(1) that Martin owed a duty of trust and confidence to the source of the material non-public information about the SPSS transaction, namely, Dallas; (2) that Martin breached that duty by disclosing the confidential SPSS information to Conradt; (3) that Martin received a personal benefit from disclosing the information to Conradt; and (4) that Conradt's tippees, defendants Payton and Durant, understood both that the SPSS information was confidential and that Martin had disclosed this information to Conradt in exchange for a personal benefit." See Payton, 155 F. Supp. 3d at 431.

3

In their instant motions, defendants raise four main challenges to the verdict, all of them similar to arguments the Court effectively rejected when it denied defendants' pre-trial motions for summary judgment and held that a reasonable jury could find defendants liable for insider trading. See id. at 431-34. Given the facts the jury could reasonably have found – both from the SEC's affirmative evidence and from the adverse inferences the jury was entitled to draw from the inconsistent testimony and doubtful demeanor of the defense witnesses – the Court has no difficulty in rejecting these arguments anew.

First, defendants argue that Martin did not breach a duty of trust and confidence he owed to Dallas. More precisely, defendants argue that no legally cognizable confidential duty arose in the first place. But under Rule 10b5-2 (and as the jury was instructed), a duty of trust and confidence arises "[w]henever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality[.]" 17 C.F.R. § 240.10b5-2(b)(2). The jury's finding that Martin owed Dallas such a duty is supported by abundant evidence.

4

To begin with, the excerpts of the Dallas and Martin videotaped deposition transcripts that were played to the jury showed clearly that Dallas and Martin enjoyed a close relationship of trust and confidence, including sharing private and sensitive matters about their careers, salaries, friends, and romantic partners. See, e.g., Deposition Transcript of Trent Martin ("Martin Tr.") at 43-46; 116-31; Deposition Transcript of Michael Dallas ("Dallas Tr.") at 41-44, 62-66, 77-81. Against this background, Dallas shared details about the SPSS transaction with Martin because Dallas, a young associate, was "apprehensive" about being assigned to work on a high-profile deal for a major client under the direction of a "fearsome" partner, and wanted Martin's support and reassurance. Dallas Tr. at 69-70, 77-80, 133-135; Martin Tr. 49-51. Dallas expected that Martin would keep the SPSS information to himself, Dallas Tr. at 81-82, and, as even Martin confirmed (Martin Tr. at 61-63), Dallas felt so angry when he learned that Martin had traded on the information that he insisted that Martin unwind the trades before the SPSS transactions was announced (Dallas Tr. at 78-82, 90-93, 142).

Given all this and given their prior history of sharing in confidence private, even intimate, details about their personal and professional lives, the jury could readily have concluded

that it was more likely than not that Martin knew, or had reason to know, that Dallas expected him to keep the SPSS information confidential.

True, there was conflicting evidence. In particular, Martin claimed that he initially had the impression that Dallas expected him to trade on the SPSS information. Martin Tr. at 57. Martin also sent Dallas an ambiguous, if suggestive, text message reading, "I'm going to hit that stock, I reckon." Trial Tr. at 394; Dallas Tr. at 205-07. But given the foregoing evidence that Martin knew or had reason to know that Dallas expected him to keep the information in confidence but simply chose to disregard it for his own selfish reasons, the jury easily could have rejected any conflicting evidence and concluded that Martin owed Dallas a confidential duty. It is not the function of a court on a Rule 50 motion to re-weigh evidence or assess credibility. Reeves, 530 U.S. at 150-51.[2]

Second, defendants argue that there was insufficient evidence from which a rational juror could conclude that Martin received a personal benefit in exchange for tipping Conradt. In

---

[2] Defendants also argue that Dallas, who came by the SPSS information in his capacity as a transactional lawyer, was the "true" insider in this case, not Martin. But nothing in Rule 10b5-2, or anything else, suggests that a person who owes a fiduciary duty to his employer cannot be owed a confidential duty by that person's confrere.

the seminal case of Dirks v. SEC, the Supreme Court defined such personal benefit to include "when an insider makes a gift of confidential information to a trading relative or friend," 463 U.S. 646, 664 (1983), a standard easily met here. But in United States v. Newman, 773 F.3d 438 (2d Cir. 2014), the Second Circuit decreed that a personal benefit may be inferred from such a relationship only where it is a "meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." Id. at 452. While the vitality of this pronouncement is somewhat in doubt, see Salman v. United States, _ U.S _, No. 15-628 (argued Oct. 5, 2016), the jury, having been instructed in accordance with Newman, could have readily found that even that high standard was met here.

To start with, a rational jury could have concluded that Martin and Conradt were in fact close friends. The two men considered each other friends and not only lived together as roommates but also engaged in a variety of social activities together, such as dining, hosting parties, playing basketball, and so forth. See Martin Tr. at 12-14, 161-62; Trial Tr. at 95-98, 112-14, 140-41. While at trial, Conradt attempted to downplay their relationship, his testimony was so thoroughly

7

impeached that the jury could not only have disregarded as much of it as they then saw fit, but also could have drawn an adverse inference. See Memorandum Order and Final Judgment, at 7-10, SEC v. Conradt, No. 12-cv-8676, ECF No. 106.

The jury also heard more than ample evidence showing that Martin tipped his friend Conradt in order to benefit him, which, under the language of Dirks at least, would have been a sufficient personal benefit. See Dirks, 463 U.S. at 664. Indeed, shortly after his initial tip to Conradt, Martin gave him a Post-It note on which he had written the stock ticker symbol for SPSS. See Trial Tr. at 174-75. Later on, Martin told Conradt that they "could make some money on" SPSS stock and that it was a "good opportunity"; according to Conradt, Martin also urged him to buy SPSS stock. Id. at 181-82, 219.

Finally, the jury also could have found a Newman-like quid pro quo between Martin and Conradt in any of several favors the latter gave the former. For example, Martin repeatedly testified that he tipped Conradt in exchange for advice about the legality of trading on the information:

> Q: And how did you come to tell [Conradt] about [the potential acquisition of SPSS by IBM]?
>
> A: So I had bought the stock and I was sort of wanting to get his advice on the legality around the trading. He was a lawyer who worked in the securities industry, so, you know, I was interested in what he thought and so, you know, I

8

>  disclosed the aspects of the deal in or during the course
>  of that discussion.

Martin Tr. at 196; see also id. at 21-22, 200.[3] Defendants argue that this evidence cannot satisfy the quid pro quo theory because the jury heard only that Martin wanted Conradt's advice, not that Conradt provided any. However, that advice was sought is circumstantial evidence that advice was given, and the jury could infer from the fact that Martin provided further tips that Conradt gave him the advice he wanted.

The jury also could have found a quid pro quo in Conradt's help to Martin in connection with Martin's arrest. Around the same time that Martin was tipping Conradt, Martin was arrested near Grand Central Station and charged with destruction of property. See Trial Tr. 153-56; Martin Tr. at 186-87. Conradt (who was among the first people whom Martin told about the arrest) put Martin in touch with a law clerk friend, who gave him advice; Conradt also helped Martin find counsel and

---

[3] Defendants accuse the SEC of having shifted personal benefit theories during the litigation, claiming that this particular quid pro quo was not alleged in the complaint. See Defendants' Reply to the SEC's Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law ("Def. Reply"), ECF No. 178, at 1-2. But the complaint adequately alleged the "quid pro quo" theory, and these particular facts were elicited during Martin's pre-trial deposition. Indeed, when the SEC made this precise argument during summation, no objection was raised by the defendants. See Trial Tr. at 908-09.

9

suggested legal strategies he could use to fight the charges. See Martin Tr. at 36-37, 187-95; Trial Tr. at 156-62. Critically, Martin himself linked the SPSS tips to Conradt's assistance with his arrest. The day the SPSS acquisition was announced, Martin told Conradt that he was "glad you made some money and thanks for all the help with Grand Central." Trial Tr. at 283-84.

Conradt's provision of household services would also support a jury finding of a quid pro quo exchange. Among other services, Conradt negotiated a reduction in rent and monthly bills, convinced their landlord to make repairs, and had the city remove a bad-smelling truck from their street. See Trial Tr. 116-42. True, none of these is momentous on its own, and a trade of the SPSS information for these services may well have been a bad deal. But all Newman requires is a benefit "of some consequence," see 773 F.3d at 452, which is plainly met here.[4]

In short, when the fact of the men's close friendship is combined with Martin's intention to benefit Conradt with the tips and Conradt's legal advice on the propriety of trading, his help on Martin's arrest, and his undertaking of household services, the jury had a more than ample basis to find a

---

[4] Although Conradt and Martin denied that they exchanged tips for benefits, see Trial Tr. at 285-87, 292-94; Martin Tr. at 22-23, the jury had more than an ample basis to discount their denials.

10

"meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." See id.

Third, the defendants argue that there was insufficient evidence to find that they knew or had reason to know that the Martin disclosed the SPSS information in exchange for a personal benefit.[5] "This is a fact-specific inquiry turning on the tippee's own knowledge and sophistication and on whether the tipper's conduct raised red flags that confidential information was being transmitted improperly." See SEC v. Obus, 693 F.3d 276, 288 (2d Cir. 2012). Moreover, in a civil case like this one, the SEC need only prove "'that the defendants knew or had reason to know of the benefit to the tipper,' in the general sense that they understood that a benefit was provided." Payton, 155 F. Supp. 3d at 433 (quoting Gordon v. Sonar Capital Mgmt., 116 F. Supp. 3d 360, 363 (S.D.N.Y. 2015)) (alterations and

---

[5] The parties separately briefed whether defendants were aware of Martin's breach of confidential duty and whether they were aware of his personal benefit. However, as Newman makes clear, the breach is the disclosure of confidential information in exchange for a personal benefit, see 773 F.3d at 449 (citing Dirks, 463 U.S. at 662), so the parties' framing is both redundant and incomplete. In reality, there is but one issue: whether the defendants were aware that confidential information was disclosed in exchange for a personal benefit.

11

internal quotation marks omitted). The proof in this case easily met this standard.

Defendants were sophisticated investment professionals who understood that information about unannounced corporate transactions was confidential and valuable. See Trial Tr. 420-27, 490-92, 674-80, 692-93, 724. They generally tried to learn as much as possible about potential investments before trading. Id. at 493-94, 735. They were also well aware of the prohibition on insider trading, so much so that Payton testified that the SPSS information would have become "worthless" if he had learned that it came from an SPSS insider, because he would have been unable to trade on it. Id. at 427-33, 496, 679-86.

That was defendants' background when Conradt, a green broker whose professional abilities they held in small regard, began sharing increasingly specific information about the SPSS deal with them as the transaction date approached. Id. at 241-48, 261, 455-56, 697-99. Conradt told them the source of the information was his roommate Trent Martin and warned them not to share it any further. Id. at 242-44, 247-48, 271-74. Durant took that warning to heart, concealing the information from another coworker who saw him researching SPSS on his computer. Id. at 271-72. On a few occasions, Durant asked Conradt if his roommate had learned any more SPSS information. Id. at 256-57. But

12

neither defendant ever asked Conradt how his roommate came by the information or why his roommate shared it with him. Id. 497-98; 736-39. And so without asking any questions, and crediting the inexperienced Conradt's tips, they nonetheless made risky, speculative investments in SPSS securities, and turned handsome profits. Id. at 414-15, 731. These are classic signs of "conscious disregard."

Defendants' conduct after the SPSS acquisition was announced further supports the inference that they generally understood, but had consciously avoided learning, the means by which the confidential SPSS information had been obtained. The evening of the announcement, Conradt, Payton, Durant, and others whom Conradt had tipped met in a hotel room to privately discuss their SPSS trades. Id. at 280-82. They resolved to retain lawyers and not talk to authorities if they received inquiries about their trades; Durant also suggested that they say they "liked tech." Id. at 282-83, 643. They lied to their employers about their SPSS trades, hiding the fact that they received highly specific tips from Conradt well in advance. Id. at 541-47, 761-63. Payton tried to cover his tracks by transferring the proceeds from his SPSS trades into a new account, and he lied to the new broker as well. Id. at 523-33.

13

There was, in short, plentiful evidence from which the jury could have concluded that defendants deliberately chose not to ask Conradt questions about the circumstances in which Martin told him about the confidential SPSS information, because they understood that there was a high probability that they would have learned of Martin's personal benefit. Insider trading law may not be circumvented so easily. See Obus, 693 F.3d at 288-89.

Fourth, and notwithstanding the extensive record evidence of both personal benefit and conscious avoidance, defendants appear to suggest that the verdict is infirm on both elements because of putative juror confusion. See Defendants' Renewed Motion for Judgment as a Matter of Law ("Def. Mem."), ECF No. 171, at 10-12. They claim that the jury thought it could find defendants liable if it concluded there was a high likelihood that the SPSS tip had been exchanged for a personal benefit, even if it rejected the SEC's specific personal benefit theories or found that defendants had no reason to know about a personal benefit. This argument has no merit.

Defendants first point to a note from the jury that purportedly reflects confusion during deliberations. Quoting the relevant portion of the jury instructions, the note read, "'Also, this requirement can be satisfied if you find that the defendant you are considering was aware of a high probability

14

that someone had improperly disclosed the inside information to Conradt for personal benefit.' Can you elaborate on this as it relates to <u>high probability</u> and <u>personal benefit</u> of the person providing the information?" Trial Tr. at 1098, 1100-01 (emphasis in jury note). In response, the Court instructed the jury that, to find defendants liable under a conscious avoidance theory, the jury must find that defendants avoiding making inquiries "because they realized that, if they did so, there was a high likelihood that they would learn that someone had improperly disclosed inside information to Conradt <u>for that person's personal benefit</u>." Judge's Note to the Jury dated Feb. 29, 2016, ECF No. 137 (emphasis added). In short, the jury instructions properly tracked <u>Newman</u>, and cured any possibly confusion on the jury's part (even assuming, <u>arguendo</u>, that there was any confusion at all). See <u>United States v. Stewart</u>, 433 F.3d 273, 307 (2d Cir. 2006).

Defendants also point to alleged juror statements made post-trial that are purportedly at odds with the verdict. This fares no better. After the trial, two jurors allegedly said that they did not think that Martin had tipped Conradt in exchange for the specific personal benefits identified at trial. They instead believed that defendants, as sophisticated traders, should have known that some benefits were exchanged. <u>See</u> Decl.

15

of Matthew E. Fishbein, ECF No. 172. Even assuming arguendo that these statements are somehow inconsistent with the verdict,[6] "[i]t is well established that evidence from a jury or juror may not be used to impeach the jury's verdict," Ohanian v. Avis Rent A Car Sys., Inc., 779 F.2d 101, 110 (2d Cir. 1985) (citing Fed. R. Ev. 606(b)), and courts routinely reject attempts to impeach a verdict with post-trial juror statements that allegedly show confusion. See, e.g., U.S. Football League v. Nat'l Football League, 644 F. Supp. 1040, 1043-45 (S.D.N.Y. 1986). So too here. The Court will not consider these statements.

Finally, defendants seek reductions to the civil penalties imposed against them (but not the disgorgement or prejudgment interest) and a graduated payment schedule. On May 15, 2016, the Court imposed civil penalties of $243,860.20 against Payton and $606,351.25 against Durant, to be paid at the rate of 20% of each defendant's gross monthly income. See Memorandum Order and Final Judgment, ECF No. 167, at 13. Defendants argue that these

---

[6] At most, these statements show that two jurors did not endorse the quid pro quo theory of personal benefit; but as explained above, a rational jury equally could have inferred a personal benefit from the men's close relationship and Martin's intention to benefit Conradt. As for the statement that "[w]e just assumed that you can't just believe someone would give this kind of information without expecting a benefit," Decl. of Matthew E. Fishbein, Ex. A, at 2, that is effectively a layperson's paraphrase of the conscious avoidance theory, for which defendants cannot complain.

16

penalties are so severe that they may never recover, especially because they are barred from the securities industry. Durant represents that he has not been able to secure any employment at all, and Payton claims that his salary of $39,000 per year is barely sufficient to support him and his family even before his penalty is considered. See Def. Mem. at 16-17; Def. Reply at 9.

The Court is not convinced that these penalties, which are the norm in both civil and criminal cases, are nearly as burdensome as defendants allege. Nor do the precedents support their position. See In re Health Mgmt. Sys. Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) ("[R]econsideration of a previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources."); see also SEC v. Warren, 534 F.3d 1368, 1370 (11th Cir. 2008) ("[N]othing in the securities laws expressly prohibits a court from imposing penalties or disgorgement liability in excess of a violator's ability to pay."). Nonetheless, in the interest of facilitating the defendants' rehabilitation, the Court will reduce the rate of payment of their respective penalties to 10% of their respective gross monthly incomes.

SO ORDERED.

Dated:   New York, NY
         November 28, 2016

JED S. RAKOFF, U.S.D.J.

17